# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | |
|---|---|
| DOROTHY FORTH, LISA BULLARD, RICARDO GONZALES, CYNTHIA RUSSO, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 38 HEALTH AND WELFARE FUND, INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 295-295C WELFARE FUND, AND STEAMFITTERS FUND LOCAL 439, on Behalf of Themselves and All Others Similarly Situated, | Underlying Action: Civil No. 17-cv-2246 United States District Court Northern District of Illinois CLASS ACTION ORAL ARGUMENT REQUESTED |

Plaintiffs,

v.

WALGREEN CO.,

Defendant.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL NON-PARTY CAREMARK, LLC TO COMPLY WITH SUBPOENA**

# TABLE OF CONTENTS

FACTUAL BACKGROUND ........................................................................................... 4

LEGAL STANDARD ................................................................................................... 12

THE COURT SHOULD COMPEL COMPLIANCE WITH PLAINTIFFS' NON-
BURDENSOME REQUEST FOR RELEVANT COMMUNICATIONS ................................... 13

I.      The Communications Sought Are Relevant Because They Speak Directly to
        the Ultimate Issue in the Underlying Action:  Whether Walgreens Was Required to
        Consider PSC Prices in Determining Its Usual and Customary Prices. ........................... 14

II.     Plaintiffs' Requests Are Not Unduly Burdensome and Caremark's Repeated
        Failure to Provide Its Search Terms or Cost Information Regarding Its Unilateral
        Searches Fatally Undermines Any Burden Argument It May Have Had ........................ 19

        A.      Any Burden Caremark May Suffer Stems from Caremark's Violation of
                Well-Recognized Discovery Principles That Require a Collaborative
                Approach to the Identification of Custodians and Search Terms and Would
                Thus Not Be Undue ............................................................................. 20

        B.      Caremark's Failure to Provide Information It Agreed to Share Regarding
                the Costs Incurred to Conduct Its Unilateral Searches Further Undermines
                Any Claim of Burden ........................................................................... 21

III.    Caremark Has Failed to Produce a Privilege Log as Agreed and Should
        Accordingly Be Compelled to Do So ................................................................. 23

CONCLUSION ......................................................................................................... 23

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Behrend v. Comcast Corp.*,
   248 F.R.D. 84 (D. Mass. 2008)................................................................22

*Corcoran v. CVS Health Corp.*,
   No. 15-cv-3504 (N.D. Cal.) .....................................................................2

*Creative Machining & Molding Corp. v. CRC Polymer Sys., Inc.*,
   No. CV 17-30043-MAP, 2018 WL 1440320 (D. Mass. Mar. 22, 2018)................22

*DeGeer v. Gillis*,
   755 F. Supp. 2d 909 (N.D. Ill. 2010) ......................................................21

*United States ex rel Garbe v. Kmart Corp.*,
   824 F.3d 632 (7th Cir. 2016) ..........................................................15, 16

*Garcia v. E.J. Amusements of New Hampshire, Inc.*,
   89 F. Supp. 3d 211 (D. Mass. 2015) ......................................................23

*Heidelberg Americas, Inc. v. Tokyo Kikai Seisakusho, Ltd.*,
   333 F.3d 38 (1st Cir. 2003)................................................................13

*In re Grand Jury Proceedings*,
   802 F.3d 57 (1st Cir. 2015)................................................................23

*In re Grand Jury Subpoena*,
   274 F.3d 563 (1st Cir. 2001)................................................................23

*In re New England Compounding Pharmacy, Inc. Prod. Liab. Litig.*,
   No. MDL 13-2419-FDS, 2013 WL 6058483 (D. Mass. Nov. 13, 2013)..........13, 21

*Precision Airmotive Corp. v. Ryan Ins. Servs., Inc.*,
   No. 2:10-MC-244-JHR, 2011 WL 148818 (D. Me. Jan. 17, 2011)....................23

*Sheet Metal Workers Local No. 20 v. CVS Pharmacy, Inc.*,
   No. 16-cv-46 (D.R.I.)........................................................................1

*Vesper Mar. Ltd. v. Lyman Morse Boatbuilding, Inc.*,
   No. 2:19-CV-00056-NT, 2020 WL 877808 (D. Me. Feb. 21, 2020)..............12, 19

*Williams & Cochrane, LLP v. Quechan Tribe of the Fort Yuma Indian
   Reservation*,
   No. 17CV1436-GPC (MSB), 2020 WL 2747117 (S.D. Cal. May 27, 2020).........20

**Statutes, Rules & Regulations**

Fed. R. Civ. P. 26 ................................................................................................................1

Fed. R. Civ. P. 45(d)(2)(B)(i) ...........................................................................................12

Fed. R. Civ. P. 45(d)(3) ......................................................................................................13

Fed. R. Civ. P. 45 ...........................................................................................................1, 12


**Other Authorities**

9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure
   §2459 (3d ed. 2020) ....................................................................................................13

8 Charles Alan Wright et al., Federal Practice and Procedure §2008 (3d ed. 2020) ....................13

Plaintiffs Dorothy Forth, Lisa Bullard, Ricardo Gonzales, Cynthia Russo, International Brotherhood of Electrical Workers Local 38 Health and Welfare Fund ("IBEW Local 38"), International Union of Operating Engineers Local 295-295C Welfare Fund, and Steamfitters Fund Local 439 ("Plaintiffs") respectfully submit this memorandum of law in support of their motion for an order pursuant to Fed. R. Civ. P. 26 and 45 compelling non-party Caremark, LLC ("Caremark") to produce within 14 days documents responsive to Document Request Nos. 2, 3, and 4 of Exhibit A to the Subpoena to Testify at a Deposition in a Civil Action, dated July 26, 2019, Ex.[1] 4. (the "Amended Subpoena"), by searching the custodial files of Todd Guinn, William Wellman, Stephanie Harris, and Thao Pham, for the period 2016-2018, using the search terms "PSC" OR (Walgreen! AND (usual w/2 cust*)) OR (Walgreen! AND (u pre/2 c)), and to produce a privilege log.

Plaintiffs are consumers and third-party payers who allege that Defendant Walgreen Co. ("Walgreens") engaged in an unlawful scheme to inflate the usual and customary ("U&C") price of generic prescription drugs. Walgreens offers cash-paying members of the general public access to discounted prices on thousands of generic prescription drugs through its Prescription Savings Club ("PSC"). Walgreens' PSC prices represent its actual U&C prices for drugs offered through the PSC, and Walgreens was required to report and charge Plaintiffs the PSC prices as its U&C prices. Instead, Walgreens intentionally reported inflated U&C prices for drugs covered by the PSC on claims for reimbursement submitted to third-party payers.

Caremark is no innocent bystander to the issues raised in the underlying action. Other consumers and third-party payers have sued Caremark's parent company for similarly failing to

---

[1]     All references to "Ex." are to the Declaration of Carey Alexander in Support of Plaintiffs' Motion to Compel Non-Party Caremark, LLC to Comply with Subpoena ("Decl."), submitted contemporaneously herewith.

report its Health Savings Pass ("HSP") prices as its U&C prices.  *See Sheet Metal Workers Local No. 20 v. CVS Pharmacy, Inc.*, No. 16-cv-46 (D.R.I.); *Corcoran v. CVS Health Corp.*, No. 15-cv-3504 (N.D. Cal.).  Caremark also serves as the pharmacy benefit manager ("PBM") for one of the named Plaintiffs, IBEW Local 38, ███████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████.  Caremark's actions, including its communications related to the definition of "usual and customary" are thus central not just to Plaintiffs' claims, but to Walgreens' defenses.

Walgreens claims that the definition of the usual and customary price is set by contracts Walgreens entered into with various PBMs, including Caremark.  Caremark, in defending its own suits, makes the same claim.  For two years, Plaintiffs have sought – first from Walgreens, and now from Caremark – communications concerning the definition of usual and customary found in Walgreens' contracts with Caremark, and communications with Caremark relating to the inclusion of PSC prices in reporting Walgreens' U&C prices.

Communications between Walgreens and Caremark related to the definition of usual and customary undoubtedly exist.  Over the course of their extensive and ongoing business relationship, ████████████████████████████████████████████████████████████████ ████████████████████████████████████████.  Yet, despite repeatedly representing to Plaintiffs that its production is substantially complete, including as to its production of communications with Caremark, Walgreens produced very few communications exchanged with Caremark – less than 210 communications for a relevant time period that spanned more than a decade, from 2007 through the present.  In stark contrast, for the same time period, Walgreens produced more than 1,000 communications with other major PBMs like Optum, Inc. ("Optum").

In response to Plaintiffs' Amended Subpoena, Caremark agreed to meet and confer regarding the search terms it would use to identify communications responsive to Plaintiffs' Amended Subpoena, and the custodians whose files were to be searched.  Despite this agreement, Caremark has refused to run Plaintiffs' proposed search terms.  Instead, Caremark, without consulting Plaintiffs, engaged in two unilateral searches for documents using patently deficient search terms, and now declares that its work is done.  Caremark's searches, which unearthed only 72 communications over a decade-long period, were designed to fail.  Caremark excluded from its searches some of the most critical search terms that would have identified responsive communications.  For instance, Caremark did not use "PSC," which is the most common way of referring to Walgreens' Prescription Savings Club.  Caremark also failed to use common variants of terms designed to identify communications relating to the "usual and customary price," such as (usual w/2 cust*) OR (u pre/2 c).

Caremark claims that running Plaintiffs' proposed search terms would be unduly burdensome.  Before running its unilateral searches, Caremark speculated that custodial searches might cost up to $30,000.  But despite agreeing to provide Plaintiffs with information regarding the actual costs associated with its unilateral searches, Caremark has provided nothing more than silence, refusing to provide Plaintiffs with any information regarding the burden associated with running either its own or Plaintiffs' proposed search terms.  Caremark not only has stymied Plaintiffs' efforts to meet and confer, but has undermined any argument it might have regarding its purported costs and undue burden associated with performed the previously agreed upon searches.  Notably, Caremark appears to have willingly complied with the production demands of a far broader and later-served subpoena from Walgreens.  Thus, any claim of burden must also be

measured against the steps Caremark took in responding to Walgreens' subpoena and it lack of any burden in doing so.

Discovery in the underlying action is currently set to close on July 16, 2020. *Forth*, ECF No. 272. Because the communications sought are of the utmost relevance to Plaintiffs' claims and Walgreens' defenses, and because Caremark has failed to establish that Plaintiffs' Amended Subpoena presents an undue burden, the Court should grant Plaintiffs' Motion to Compel.

## **FACTUAL BACKGROUND**

Consistent with their obligation to seek the production of documents through party discovery in the first instance, Plaintiffs served Walgreens with several document requests relating to communications exchanged with PBMs like Caremark, including, in particular:

- "Documents exchanged with pharmacy benefit managers concerning Walgreens' Prescription Savings Club" (Ex. 7, Request No. 16); and

- "Documents exchanged with any pharmacy benefit managers concerning Walgreens' policies, procedures, guidelines, formulas, methodologies, practices, and/or rules related to Walgreens' determination of its prices for Prescription Drugs" (*Id.*, Request No. 17).

In response to Plaintiffs' document requests, Walgreens represented that it engaged in an extensive search for documents relevant to Plaintiffs' claims and Walgreens' defenses that included the collection of over 5 million documents for review. *Forth*, ECF No. 137 at 5. To identify responsive documents, Plaintiffs and Walgreens met and conferred and collaboratively developed a set of search terms that the parties agreed were likely to identify responsive documents. Decl., ¶4. The more than two-dozen search terms Plaintiffs and Walgreens agreed to use included, among others: "psc", "u pre/2 c", and "usual w/2 cust*". *Id.* These terms were included in particular because "PSC" is the most commonly used shorthand to refer to the Prescription Savings Club, and because of the substantial variation used in referring to the "usual and customary" price. *Id.*

On April 29, 2019, Walgreens represented to Plaintiffs that it had substantially completed its production of documents responsive to Plaintiffs' requests. *Id.*, ¶5.

By letter dated May 30, 2019, Plaintiffs wrote to Walgreens to express concern with the lack of responsive documents pertaining to documents exchanged with PBMs. Ex. 8. In particular, Plaintiffs explained to Walgreens that Plaintiffs had been able to identify only 64 documents associated with a Caremark email domain, *id.* at 1, a result Plaintiffs explained was "particularly troubling given that Caremark is one of the three largest pharmacy benefit managers in the country." *Id.* at 2. Plaintiffs specifically asked Walgreens to "investigate and explain" why its production of documents related to Caremark was so small. *Id.*

Following Plaintiffs' letter, Walgreens made two additional productions of documents. Decl., ¶5. By letter dated June 14, 2019, Walgreens confirmed that its "production of responsive documents exchanged with the Relevant PBMs is substantially complete." Ex. 9 at 2. While Walgreens represented that, as a result of its subsequent productions, it was then able to identify 163 documents associated with Caremark email domains, Walgreens' production related to its communications with Caremark is deficient when compared to the number of documents Walgreens has produced relating to its communications with other major PBMs. *Id.* For example, Walgreens was able to identify and produce 1,129 documents associated with Express Scripts, Inc., and 779 emails associated with Optum. *Id.* By contrast, even following subsequent productions, for all of 2016, Walgreens identified and produced only 28 emails exchanged between Walgreens and Caremark. Decl., ¶ 7. In all of 2017, ██████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████, Walgreens identified and produced only 69 emails exchanged

between Walgreens and Caremark.  *Id.*  And in all of 2018, Walgreens produced only 52 emails exchanged between Walgreens and Caremark.  *Id.*

Plaintiffs' initial subpoena to Caremark was served on August 24, 2018.  Ex. 2.  Caremark served its initial Objections and Responses on October 4, 2018.  Ex. 3.  On July 29, 2019, Plaintiffs served Caremark with an Amended Subpoena, Ex. 4, narrowing the categories of documents requested in light of discovery received from Walgreens since the original subpoena was served.

In the Amended Subpoena, Plaintiffs sought three categories of communications Caremark exchanged with Walgreens:

- Document Request No. 2 calls for the production of: "Communications between you and Walgreens concerning contracts, agreements, and pharmacy manuals, including amendments, relating to the administration of prescription drug benefits that applied or that currently apply to any of the Plaintiffs' prescription drug purchases from Walgreens."  Ex. 4 at 10.

- Document Request No. 3 calls for the production of Caremark's "Communications with Walgreens concerning amendments to the definition of 'usual and customary' price in contracts, agreements, and pharmacy manuals relating to the administration of prescription drug benefits."  *Id.*

- Document Request No. 4 calls for the production of Caremark's "Communications with Walgreens relating to the inclusion or consideration of the PSC Prices in the calculation, establishment, or reporting of its 'usual and customary' price for PSC Drugs."  *Id.*

Plaintiffs and Caremark met and conferred on July 30, 2019.  Decl., ¶9; Ex. 10.  In an email memorializing the meet and confer, counsel for Caremark represented that "Caremark will not at this time be searching for or producing for documents in response to your subpoena."  Ex. 10.

By letter dated October 16, 2019, Plaintiffs informed Caremark that they had "endeavored to further reduce" any burden associated with their subpoena "by conducting additional analysis of Walgreens' document production."  Ex. 11 at 1.  Plaintiffs explained that their analysis had "identified gaps of information requested by the subpoena that have not been produced in response to Plaintiffs' overlapping document requests served on Walgreens," and asked Caremark to

"produce the necessary documents to fill those gaps." *Id.* To aid Caremark in the identification and designation of custodians that may possess responsive communications, Plaintiffs listed the top five individuals that communicated with employees of Walgreens (by e-mail count), which included: Stephanie Harris, Todd Guinn, Robert Burge, Robert Stone, and William Wellman. *Id.*

Plaintiffs and Caremark met and conferred again on October 23, 2019. Decl., ¶10. During that call, Plaintiffs reiterated that they were not broadly asking Caremark to produce any and all communications it had with Walgreens, but rather, to confirm whether additional documents existed to fill the gaps Plaintiffs' had identified in Walgreens' production. *Id.* On October 31, 2019, in response to Caremark's request, Plaintiffs provided Caremark with a list of Walgreens employees with whom Caremark employees communicated that Plaintiffs had identified from Walgreens' document production. *Id.*

On November 13, 2019, Caremark provided Plaintiffs with its Objections and Responses to Plaintiffs' Amended Subpoena. Ex. 5. (Caremark's "Objections and Responses"). In its Objections and Responses to Document Request Nos. 2-4, Caremark stated it was "willing to meet and confer with Plaintiffs about the feasibility and burden of applying a reasonable set of search terms to certain Caremark custodians' documents that have previously been collected in similar litigation, in order to locate responsive documents." *Id.* at 15-17.

But Caremark did not meet and confer with Plaintiffs. Instead, on January 16, 2020, absent any further discussion, Caremark produced 64 communications to Plaintiffs. Decl., ¶11. Each of the communications came from the custodial file of a single individual, Todd Guinn. None were from after June 2015. *Id.* Yet still, Caremark's limited production contained communications relating to Caremark's contracts with Walgreens that Walgreens had failed to produce to Plaintiffs, validating Plaintiffs' concern that other emails likely exist. *Id.*

By letter dated January 21, 2020, Plaintiffs asked Caremark to meet and confer so that Plaintiffs could understand the search Caremark had unilaterally undertaken. Ex. 12 at 2-4. To further aid Caremark in identifying relevant custodians, Plaintiffs identified an additional individual, Thao Pham, who was likely to have relevant information regarding ███████████ ██████████████████████████████████████████████. *Id.* at 3 n.5. Finally, Plaintiffs informed Caremark that they would be "willing to propose a set of search terms to facilitate Caremark's search *following the parties' agreement on the custodians to be searched*." *Id.* at 4.

Plaintiffs met and conferred with Caremark on February 11, 2020. Decl., ¶12. During that call, Caremark informed Plaintiffs that despite having previously represented that it would not search for or produce documents in response to *Plaintiffs'* subpoena, after receiving a subpoena from Walgreens, dated November 8, 2019, Caremark had decided that it would, on its own, search for and produce documents without notice to or any further communication with Plaintiffs in order to respond to *Walgreens'* subpoena. *Id.* As Caremark explained, Caremark previously had collected the custodial files of Todd Guinn and Stephanie Harris in June 2015 in order to respond to requests served in connection with litigation involving CVS' practices at its own pharmacies; therefore, Caremark stated that it conducted its search by running unilaterally selected, unspecified, search terms against these two previously collected custodial files. *Id.* These custodial files, however, necessarily could not (and did not) include any potentially responsive material dated after Caremark's June 2015 date of collection. In other words, Caremark unilaterally truncated the Relevant Time Period identified in Plaintiffs' subpoena, which extends from January 1, 2007 to the present. Yet, after 2015 is exactly the time period for which Plaintiffs know that relevant communications between Walgreens and Caremark likely existed in light of

███████████████████████████████████████████████████████████████

██████████████████.  *See, e.g.*, Exs. 26-33.  Caremark represented that it would be happy to share the terms used with Plaintiffs, but said it did not intend to conduct any additional searches for responsive information – notwithstanding the additional custodians Plaintiffs had identified, or the fact that Caremark's search did not extend beyond June 2015.  Decl., ¶12.

By email dated February 12, 2020, Plaintiffs specifically asked Caremark to share the search terms it used to conduct its unilateral search.  Ex. 13.  Plaintiffs reiterated that Caremark's failure to search for documents after June 2015 was "especially troubling in light of ████ ███████████████████████████████████████████████████████████ ████████████████████████████████."  *Id.*  Plaintiffs thus specifically requested that Caremark agree that any future searches would include the custodial files of Todd Guinn, William Wellman, Stephanie Harris, and Thao Pham.  *Id.*

Yet Caremark still did not provide Plaintiffs with the search terms that it used to conduct its unilateral search.

During a March 3, 2020, meet and confer, Caremark proposed that, if Plaintiffs were also willing to drop their separate request for transactional data – which IBEW Local 38, as a continuing client of Caremark's, had a contractual right to obtain – Caremark would be willing to engage in a self-collection process by which it would ask the individuals Plaintiffs had identified whether they recalled ███████████████████████████████████████████████████████ ██████████.  Decl., ¶13.  Caremark also said it would want Plaintiffs to bear the cost of any additional searches.  *Id.*  In exchange for Plaintiffs' request for an estimate regarding the potential cost of such searches, Caremark stated that "a very preliminary estimate is that the fees of Caremark's outside e-discovery vendor and outside counsel could well exceed $30,000."  Ex. 14.

Plaintiffs rejected Caremark's proposed self-collection process, not least because one of the four proposed custodians, Ms. Pham, had not worked for Caremark for several years.  Ex. 15 at 3-4.  To avoid impasse, Plaintiffs proposed to "limit their request to a custodial search of the four individuals previously identified, further limited to 2016-2018, to be conducted using an agreed-upon set of search terms, with Caremark to bear its own costs."  *Id.* at 4.

Notwithstanding Plaintiffs' request, Caremark responded on March 9, 2020, by stating that it was undertaking the self-collection process Plaintiffs had rejected and intended to perform "searches . . . in-house at Caremark" for the four individuals Plaintiffs had identified, and stated that it intended to produce documents four days later.  *Id.* at 2.

That evening, Plaintiffs responded with a request for "[c]larification with regard to the parameters of the proposed 'in-house' search."  *Id.* at 1.  In particular, Plaintiffs asked Caremark to explain: "Is this an ESI search? For all electronically maintained documents, or email only?  For what time period?  Using what search terms?"  *Id.*  Plaintiffs also specifically offered to propose "specific search terms to obtain these documents in an efficient manner."  *Id.*

Plaintiffs received no response.  Instead, Caremark conducted a second unilateral search without any further input from Plaintiffs, and on March 18, 2020, produced an additional eight communications.  Decl., ¶14.

On April 7, 2020, while renewing their request for Caremark to conduct a search for 2016-2018 of the four identified custodial files as requested, Plaintiffs asked Caremark to "state whether it has withheld any responsive documents on the basis of privilege, and identify the custodial files searched and the terms used to conduct the search."  Ex. 16.  Plaintiffs also asked Caremark to provide information on the actual costs incurred to conduct its unilateral search.  *Id.*

The parties met and conferred on April 16, 2020.  Decl., ¶15.  During that meet and confer, Caremark again agreed to provide the search terms it had used, and additionally agreed to provide a privilege log and information regarding the costs incurred to conduct its unilateral search.  *Id.*  Plaintiffs stressed that if the parties could reach agreement on the search terms and Caremark agreed to search for responsive documents from the four identified custodial files for 2016-2018, motion practice could be avoided.  *Id.*; *see also* Ex. 17.

Caremark did not respond until May 15, 2020.  Ex. 18.  Again, it failed to provide Plaintiffs with the search terms it had used, the privilege log it had promised to produce, or information regarding the costs incurred to conduct its unilateral search.  *Id.*

On June 5, 2020, having still not received any of the information Caremark had previously agreed to provide, Plaintiffs sent yet another request.  Ex. 19 at 2.

On June 8, 2020, Caremark, for the first time, disclosed that it had used the following terms to identify potentially responsive documents for only a three-month period between April and July 2017:

- "prescription drug savings card programs" OR

- (Walgreen! AND "U&C") OR

- (Walgreen! AND "usual and customary charge") OR

- "prescription savings club".  *Id.*

As Plaintiffs explained to Caremark by letter dated June 12, 2020 – and would have explained to Caremark sooner if Caremark had met and conferred regarding search terms – Caremark's terms were patently deficient.  Ex. 21.  While seemingly conceding that documents related to the PSC were potentially responsive, rather than search for communications that included the term "PSC," as the program is known, Decl., ¶4, Caremark searched only for the PSC's formal name, the "Prescription Savings Club."  Ex. 19.  Similarly, by searching only for

documents that referred to Walgreens and the "usual and customary **charge**," *id.* Caremark excluded the most common way writers would refer to "usual and customary," including by reference to the usual and customary **price**.  Decl., ¶4.  Plaintiffs requested that Caremark search for documents referring to the PSC and usual and customary price by using the same terms Walgreens had agreed to use, namely: "PSC" OR (Walgreen! AND (usual w/2 cust*)) OR (Walgreen! AND (u pre/2 c)), for the 2016-2018 period.  Ex. 21.

Caremark refused, and the parties confirmed that they were at impasse necessitating this motion.  Ex. 22.  To date, Caremark has still not provided Plaintiffs with either a privilege log or information relating to the costs incurred to conduct its unilateral searches, as it had agreed to do. Decl., ¶16; *see also* Ex. 20 (when asked on June 8, 2020, when Caremark expected to provide such information, counsel merely responded:  "I'm not sure.").

## LEGAL STANDARD

Federal Rule of Civil Procedure 45 provides that "[a]t any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection." Fed. R. Civ. P. 45(d)(2)(B)(i).  Though "'governed in the first instance by Rule 45,'" third-party subpoenas are "'also subject to the parameters established by Rule 26.'"  *Vesper Mar. Ltd. v. Lyman Morse Boatbuilding, Inc.*, No. 2:19-CV-00056-NT, 2020 WL 877808, at *1–2 (D. Me. Feb. 21, 2020) (collecting cases).[2]  Rule 26(b)(1) provides in relevant part that the proper scope of discovery encompasses "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ."  Fed. R. Civ. P. 26(b)(1).  Although Plaintiffs bear an initial burden to establish the relevance of the information sought, the burden is minimal in light of the First Circuit's

---

[2]        Unless otherwise indicated, citations are omitted and emphasis is added.

command to "interpret liberally the discovery provisions of the Federal Rules of Civil Procedure to encourage the free flow of information among litigants . . . ."  *Heidelberg Americas, Inc. v. Tokyo Kikai Seisakusho, Ltd.*, 333 F.3d 38, 41 (1st Cir. 2003); *see also* 8 Charles Alan Wright et al., Federal Practice and Procedure §2008 (3d ed. 2020) (noting that "the amendments to Rule 26 still contemplate liberal discovery, and that relevancy under Rule 26 is extremely broad").

A non-party resisting compliance with a subpoena "bears the burden of showing that the subpoena imposes an undue burden . . . ."  *In re New England Compounding Pharmacy, Inc. Prod. Liab. Litig.*, No. MDL 13-2419-FDS, 2013 WL 6058483, at *6 (D. Mass. Nov. 13, 2013).

If a court determines that a subpoena is overbroad or that compliance would be unduly burdensome, the court "has the power to modify the scope of the subpoena and thereby remove the objectionable features from it while preserving the rest of the subpoena."  9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure §2459 (3d ed. 2020); Fed. R. Civ. P. 45(d)(3).

### THE COURT SHOULD COMPEL COMPLIANCE WITH PLAINTIFFS' NON-BURDENSOME REQUEST FOR RELEVANT COMMUNICATIONS

Plaintiffs seek communications concerning the definition of usual and customary found in Walgreens' contracts with Caremark, and communications with Caremark relating to the inclusion of PSC prices in reporting Walgreens' U&C prices.  These communications are highly relevant to Plaintiffs' claims that Walgreens was required to report its PSC prices as its U&C prices, and Walgreens' defense that its contracts did not contain such a requirement.  Compliance with Plaintiffs' repeatedly narrowed subpoena will not cause Caremark – one of the nation's largest PBMs – any undue burden; and to the extent Caremark claims otherwise, its repeated failure to provide Plaintiffs with requested information regarding the cost of compliance throughout the meet

and confer process effectuates a waiver of any such defense.  Accordingly, for the reasons set forth

below, the Court should compel compliance with Plaintiffs' narrowed Amended Subpoena.

**I.      The Communications Sought Are Relevant Because They Speak Directly to the Ultimate Issue in the Underlying Action:  Whether Walgreens Was Required to Consider PSC Prices in Determining Its Usual and Customary Prices.**

The communications Plaintiffs seek are undeniably relevant to their claims and Walgreens'

defenses.  Caremark serves as the PBM for one of the named Plaintiffs, IBEW Local 38.  ███

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████."  Ex. 25, §1.28 at IBEW_0019629.  Based on industry

practice as well as the language of this contract, Plaintiff IBEW Local 38 alleges that for drugs

that were included as of the PSC, "Walgreens should have reported and charged to Plaintiffs and

the Class the PSC Prices as Walgreens' U&C price, because the PSC Price was, and still is, the

price Walgreens charges customers paying cash without insurance."  Ex. 1, ¶12.

███████████████████████████████████████████████████████████

███████████████████████████.  Compare Ex. 25, §1.28 at IBEW_0019629 *with* Ex.

26, §1.16 at Walg_Forth_00101363.  Communications between Caremark and Walgreens related

to the definition of "usual and customary," including whether Walgreens was required to consider

its PSC prices in determining its U&C prices, are thus of critical relevance.

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████."  Ex. 25 at

Walg_Forth_00320842.  ██████████████████████████████████.



.” Ex. 23 at 207:19.

.” Ex. 27 at Walg_Forth_00165963.

.” Ex. 23 at 204:11-13.

On May 27, 2016, the Seventh Circuit handed down its decision in *United States ex rel Garbe v. Kmart Corp.*, 824 F.3d 632 (7th Cir. 2016). *Garbe* involved a *qui tam* challenge to Kmart's attempt to overcharge Medicare for generic prescription drugs. Like Walgreens and CVS (Caremark's parent), Kmart charged a fee to join its Prescription Savings Club. Like Walgreens' PSC and CVS's HSP, the purpose of Kmart's PSC was to provide low "discount" prices for cash customers who signed up for one of its programs, while charging higher "usual and customary" prices to non-program cash customers, "'to drive as much profit as possible out of [third-party] programs.'" *Id.* at 636 (brackets in original). Like Walgreens and CVS, Kmart engaged in practices that affected all "customers with insurance—whether public or private . . . ." *Id.* at 634. The district court granted partial summary judgment in the relator's favor, and the Seventh Circuit, in accepting the appeal, added the question of "whether the district court correctly identified the 'usual and customary' price." *Id.* at 637.

In *Garbe*, the Seventh Circuit held that "[u]nless state regulations provide otherwise, the 'usual and customary' price is defined as the 'cash price offered to the general public.'" *Id.* at

643.  As the Seventh Circuit observed, "[c]ash customers walking into Kmart do not cease to be members of the general public the minute they are offered—or pushed into—'membership' in Kmart's 'discount program.'"  *Id.*  As explained by the Seventh Circuit, it was the government's "regulatory structure that gave rise to" to the phrase "usual and customary" as a "price term." *Id.* Thus, unless state regulations specifically provide for a different definition, *Garbe* sets forth how the phrase "usual and customary" is to be defined within the Seventh Circuit.

*Garbe* represented a landmark decision regarding how "usual and customary" was meant to be interpreted, especially in the Seventh Circuit, where Walgreens is headquartered.  Yet, for all of 2016, Walgreens identified and produced only 28 emails exchanged between Walgreens and Caremark that bore upon the interpretation of "usual and customary."  Caremark identified none.  These gaps regarding a central issue in the underlying issue at a critical junction are too conspicuous to be ignored.



. Ex. 29.

. *Id.*, §1 at Walg_Forth_00142421.

." Ex. 30 at Walg_Forth_00169702.



██████████████████████████," Ex. 31 at Walg_Forth_00169753, ██████████

██████████████████████████." *Id.* at 16.

██████████████████████████████████████

███████████████████. *Id.* at Walg_Forth_00169753-54. █████████████

██████████████████████████████████████

███████████████████████." Ex. 24 at 280:6. █████████████████

██████████████████████████████████████

████████████████. *Id.* at 280:10-16. ████████████████████ *id.* at

281:13, █████████████████████████████." *Id.* at 282:4-5.

██████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████." *Id.* at

Walg_Forth_00196731. ██████████████████████████████

██████████████████████████████████████

██████████████████." *Id.* at Walg_Forth_00196735.  Ms. Ewing expressed "████████

██████████████████████████████████████

████ . . . ." *Id.* at Walg_Forth_00196731. █████████████████████

██████████████████████████████, Ex. 24 at 284:22, ███████████

███████████████████████████████████. *Id.* at 285:3.

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████



." Ex. 33 at Walg_Forth_00153728.

." *Id.*

. Ex. 26, §1.16 at Walg_Forth_00101363.

," Ex. 24 at 267:1-2,

." *Id.* at 268:21-25.

." *Id.* at 268:6-7.

Moreover, additional relevant communications are likely to exist because of the fact of the underlying action. Plaintiffs originally filed suit against Walgreens in March of 2017. *Forth*, ECF No. 1. In March 2018, the Court denied Walgreens' motion to dismiss, and the parties proceeded to discovery. *Forth*, ECF No. 91. It is difficult to believe that Caremark and Walgreens would not have communicated regarding the pendency of this action, brought by an existing Caremark client, challenging a practice in which Caremark's parent is alleged to have also engaged in. Any such communications, as shared between third-parties would be neither privileged nor confidential, but would be highly relevant to Plaintiffs' claims.

Thus, Plaintiffs reasonably believe that Caremark is likely to have additional communications that bear its and Walgreens' understanding of the definition of "usual and customary" that it should be compelled to produce.

## II.    Plaintiffs' Requests Are Not Unduly Burdensome and Caremark's Repeated Failure to Provide Its Search Terms or Cost Information Regarding Its Unilateral Searches Fatally Undermines Any Burden Argument It May Have Had

Having established the relevance of their requests, the Court must compel compliance with Plaintiffs' Amended Subpoena so long as the requests are not unduly burdensome.

Whether a subpoena presents an undue burden "'usually raises a question of the reasonableness of the subpoena,'" that requires the Court to "'balance the interests served by demanding compliance with the subpoena against the interests furthered by quashing it.'"  *Vesper Mar. Ltd.*, 2020 WL 877808, at *1–2 (quoting 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure §2463.1, at 507 (3d ed. 2008)).  This balancing is "'a highly case specific inquiry and entails an exercise of judicial discretion.'"  *Id.*

Caremark's repeated failure to provide Plaintiffs with the search terms it used to conduct its unilateral searches violated the requirements of parties and non-parties alike to engage in an open and transparent discovery process, and argues against a finding of undue burden resulting from Caremark's failure to adequately meet and confer in the first instance.  Further, that Caremark failed to provide Plaintiffs with any information regarding the costs of its searches that could have allowed Plaintiffs to propose a less burdensome search, despite agreeing to provide such information, should weigh heavily against a finding of undue burden.

19

A.   **Any Burden Caremark May Suffer Stems from Caremark's Violation of Well-Recognized Discovery Principles That Require a Collaborative Approach to the Identification of Custodians and Search Terms and Would Thus Not Be Undue**

Plaintiffs discussed with and believed they had agreement with Caremark regarding the process the parties would use to identify documents responsive to Plaintiffs' Amended Subpoena. The day after receiving Plaintiffs' Amended Subpoena, Caremark spoke to and confirmed with Plaintiffs that "Caremark will not at this time be searching for or producing for documents in response to your subpoena." Ex. 10.  From this, Plaintiffs reasonably understood that Caremark was not going to engage in a unilateral search for responsive documents.  After meeting and conferring, Plaintiffs provided Caremark with a list of proposed custodians and, in response to Caremark's request to help it further identify appropriate custodians, provided a list of Walgreens custodians who most frequently communicated with Caremark employees.  Ex. 11; Decl., ¶10. Caremark thereafter provided its Objections & Responses, stating that it was "willing to meet and confer with Plaintiffs about the feasibility and burden of applying a reasonable set of search terms" to certain custodians.  Ex. 5 at 15-17.  As recently as January 21, 2020, Plaintiffs confirmed that they would be "willing to propose a set of search terms to facilitate Caremark's search following the parties' agreement on the custodians to be searched."  Ex. 12.

But by failing to discuss search terms with Plaintiffs, despite repeatedly agreeing to do so, Caremark defied not just Plaintiffs' understanding, but its own affirmative discovery obligations. It is a foundational principle of modern discovery practice that "[w]hen an ESI search is required for document production, the best practice is for the parties to cooperate to reach an agreement regarding custodians and search terms to inform the document production."  *Williams & Cochrane, LLP v. Quechan Tribe of the Fort Yuma Indian Reservation*, No. 17CV1436-GPC (MSB), 2020 WL 2747117, at *7 (S.D. Cal. May 27, 2020) (collecting cases).  Indeed, the "failure

to promptly disclose the list of employees or former employees whose emails [a third-party] propose[s] to search and the specific search terms it propose[s] to be used for each individual" has been roundly criticized as "violat[ing] the principles of an open, transparent discovery process." *DeGeer v. Gillis*, 755 F. Supp. 2d 909, 929 (N.D. Ill. 2010). ("The Court is most troubled by the fact that there was no dialogue to discuss specific search terms or data custodians to be searched in advance of [the third party] conducting its searches."). A fair and honest discovery process acknowledges that while a third-party is "in the best position to take the lead in selecting data custodians and search terms," it must also be "up-front" with opposing counsel "regarding its proposed custodians and search terms and then receptive to [] counsel's input." *Id.*

Accordingly, to the extent Caremark incurs any additional burden as a result of undertaking two unilateral searches without Plaintiffs' input, such burden would be far from undue.

### B. Caremark's Failure to Provide Information It Agreed to Share Regarding the Costs Incurred to Conduct Its Unilateral Searches Further Undermines Any Claim of Burden

Caremark initially resisted compliance with Plaintiffs' Amended Subpoena on the grounds that the burden of doing so would be undue. To establish that a request is unduly burdensome, a non-party "'cannot rely on a mere assertion that compliance would be burdensome and onerous without showing the manner and extent of the burden and the injurious consequences of insisting upon compliance.'" *New England Compounding Pharmacy, Inc.*, 2013 WL 6058483, at *6.

Plaintiffs requested that Caremark provide information about its anticipated burden. Caremark, in the first instance, speculated that using an outside vendor to conduct a custodial search would cost "up to $30,000." Ex. 14. Rather than use an outside vendor, however, Caremark conducted its unilateral searches in-house. Because Caremark claimed that it intended to maintain its claim of undue burden to shield against running any additional searches, Plaintiffs requested, and Caremark agreed to provide, information regarding the cost of its in-house searches. Ex. 17.

Caremark, however, has failed to provide the information it said it had agreed to share, Decl., ¶16; Ex. 20, and its failure to do so should preclude a finding that any burden is undue.

Notwithstanding Caremark's failure to provide information it had promised to produce, the searches that Plaintiffs request do not present an undue burden. Where, as here, a party is "left with a gap in the documentary record," then "some additional effort by [a subpoenaed entity] is in order." *Creative Machining & Molding Corp. v. CRC Polymer Sys., Inc.*, No. CV 17-30043-MAP, 2018 WL 1440320, at *3 (D. Mass. Mar. 22, 2018) (holding that an email search that "would require 40 man hours" to conduct would not be unduly burdensome). In *Creative Machining*, the Court accordingly ordered the parties to confer and identify four custodians whose files were to be searched "using no more than ten relevant search terms." *Id.* Plaintiffs' request is far less onerous, calling on Caremark to run only three additional searches, for a limited time period, that are likely to identify responsive communications.

Moreover, Caremark's corporate family does not just have an interest in the litigation stemming from its engaging in the same fraudulent scheme challenged in the underlying litigation, but it has the resources that caution against a finding that any burden may be undue. As Courts have recognized, in assessing burden, the "size of [subpoenaed entity's] operations" are particularly relevant. *See*, *e.g.*, *Behrend v. Comcast Corp.*, 248 F.R.D. 84, 87 (D. Mass. 2008) (compelling search of "400–500 unorganized boxes of documents"). Caremark's parent, CVS Health Corp., describes Caremark as "a leading pharmacy benefits manager with approximately 105 million plan members," and has revenues that exceeded $130 billion in each of the last three years. CVS Health Corp., Annual Report (Form 10-K), (Dec. 31, 2019), *available at*: https://investors.cvshealth.com/investors/sec-filings/sec-filings-

details/default.aspx?FilingId=13929382.  Thus, Caremark is readily capable of running the three

additional search terms across four custodial files for 2016-2018, as Plaintiffs have requested.

### III.    Caremark Has Failed to Produce a Privilege Log as Agreed and Should Accordingly Be Compelled to Do So

Caremark has represented that it has withheld otherwise responsive documents from

production on the basis that such documents are privileged.  Decl., ¶15.  Caremark further agreed

to provide Plaintiffs with a log of all documents that it withheld on the basis of its assertion of

privilege.  *Id.*; *see also* Ex. 17.  Despite producing communications in January and March of this

year, Caremark has still failed to provide a privilege log, and has failed to indicate when it intends

to do so.  Decl., ¶16; Ex. 20.

A non-party "cannot shirk his obligation to file a privilege log," *In re Grand Jury*

*Subpoena*, 274 F.3d 563, 576 (1st Cir. 2001), and has an obligation to produce a privilege log

within a "*reasonable time*."  *In re Grand Jury Proceedings*, 802 F.3d 57, 67–68 (1st Cir. 2015)

(italics in original); *see also Precision Airmotive Corp. v. Ryan Ins. Servs., Inc.*, No. 2:10-MC-

244-JHR, 2011 WL 148818, at *6 (D. Me. Jan. 17, 2011).  The "production of a privilege log

would not represent an undue burden."  *Garcia v. E.J. Amusements of New Hampshire, Inc.*, 89 F.

Supp. 3d 211 (D. Mass. 2015).

Because Caremark has failed to produce the privilege log it agreed to and is required to

provide, the Court should order Caremark to produce a privilege log within fourteen days.

**CONCLUSION**

For the foregoing reasons, the Court should compel Caremark to produce within fourteen

days documents responsive to Request Nos. 2, 3, and 4 of the Amended Subpoena by searching

the custodial files of Todd Guinn, William Wellman, Stephanie Harris, and Thao Pham, for the

period 2016-2018, using the search terms "PSC" OR (Walgreen! AND (usual w/2 cust*)) OR (Walgreen! AND (u pre/2 c)), and a privilege log.

Dated:  June 26, 2020                                  Respectfully Submitted,
                                                       **O'NEIL LAW**


                                                        /s Edward Roy
                                                       Edward Roy
                                                       James O'Neil
                                                       The Meadows, Suite A-103
                                                       1130 Ten Rod road
                                                       North Kingstown, RI  02852
                                                       Telephone:  401 667-7111
                                                       Facsimile:  401 667-7112
                                                       edward_roy@hotmail.com
                                                       jamesoneil228@gmail.com

                                                       Joseph P. Guglielmo
                                                       Carey Alexander
                                                       **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
                                                       The Helmsley Building
                                                       230 Park Avenue, 17th Floor
                                                       New York, NY 10169
                                                       Telephone: 212-223-4478
                                                       Facsimile:  212-223-6334
                                                       *jguglielmo@scott-scott.com*
                                                       *calexander@scott-scott.com*

                                                       Erin Green Comite
                                                       **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
                                                       156 S. Main Street
                                                       P.O. Box 192
                                                       Colchester, CT 06415
                                                       Telephone: 860-531-2632
                                                       Facsimile:  860-537-4432
                                                       *ecomite@scott-scott.com*

                                                       Jason H. Alperstein
                                                       Mark J. Dearman
                                                       Stuart A. Davidson
                                                       **ROBBINS GELLER RUDMAN
                                                         & DOWD LLP**
                                                       120 East Palmetto Park Road, Suite 500

Boca Raton, FL  33432
Telephone: 561-750-3000
Facsimile:  561-750-3364
*jalperstein@rgrdlaw.com*
*mdearman@rgrdlaw.com*
*sdavidson@rgrdlaw.com*

**Interim Co-Lead Counsel**