## EUNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| DOROTHY FORTH, LISA BULLARD, RICARDO GONZALES, CYNTHIA RUSSO, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 38 HEALTH AND WELFARE FUND, INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 295-295C WELFARE FUND, AND STEAMFITTERS FUND LOCAL 439, on Behalf of Themselves and All Others Similarly Situated,<br><br>      Plaintiffs,<br><br>      v.<br><br>WALGREEN CO.,<br><br>      Defendant. | Case No: 1:20-mc-00007-MSM-PAS<br><br>Underlying Action:<br>Civ. A. No. 17-cv-2246 (N.D. Ill.) |

## NON-PARTY CAREMARK, LLC'S OPPOSITION TO
## PLAINTIFFS' MOTION TO COMPEL

Federal district courts are obliged to protect third parties from harassing subpoenas. Fed. R. Civ. P. 45(d)(1). Over the last twenty-three months, non-party Caremark, LLC ("Caremark") has been harassed with multiple subpoenas issued in the underlying matter between Plaintiffs and Walgreens; it has complied in good faith by producing thousands of pages of documents in response to those subpoenas; and it has even committed to appear for a Rule 30(b)(6) deposition in the coming weeks. But Caremark finally has said "enough is enough" in response to Plaintiffs' latest demand: that Caremark go fishing through employees' e-mail accounts for additional documents for which Plaintiffs have demonstrated no particular need.

For two main reasons, discussed further below, the Court should deny Plaintiffs' Motion to Compel Non-Party Caremark, LLC to Comply with Subpoena (hereinafter "Motion" or "Mot."). ***First***, Caremark has already responded in good faith to the parties' third-party subpoenas to the company (three, to be exact) by producing more than 3,000 pages of documents, including e-mails, and over 88,000 lines of transaction data. Nothing more should be required, particularly since Caremark has born its own review and production costs to date and Plaintiffs are refusing to pay for the additional search. ***Second***, Plaintiffs' proposed additional search is unduly burdensome and not proportional to the needs of the case, particularly given that Plaintiffs have not identified any specific documents they know exist, but that are missing, from the parties' productions in the case or in Caremark's third-party productions.

## WHAT PLAINTIFFS WANT

In their Motion, Plaintiffs seek an order compelling Caremark to run the following search for e-mails and other electronically stored information ("ESI"):

**Custodians:**   Todd Guinn, Stephanie Harris, William Wellman, and Thao Pham, Esq.

**Timeframe:**   January 1, 2016 through December 31, 2018

**Search Terms**: [1]PSC OR [2](Walgreen* and (usual w/2 cust*) OR [3](Walgreen* and (u pre/2 c)).

According to CVS IT personnel, this search returns 3,156 separate e-mails or other electronic documents that would need to be reviewed.[1]  That number almost certainly includes duplicate documents, although without more sophisticated analysis that only an outside IT vendor could perform, or manually reviewing each document, duplicates cannot be identified and weeded out.

---

[1] Declaration of Grant Geyerman ("Geyerman Decl.") ¶ 4.

If ordered to perform this search, Caremark would be performing its **third** search for ESI in response to the parties' subpoenas in this case.  That number represents two searches more than Caremark has performed in response to any one of the **ten** third-party subpoenas it has received (and responded to) since 2016 in similar cases alleging a pharmacy's membership program price like Walgreens' Prescription Savings Club should have been its "usual and customary" price.  Although this would be Caremark's third search for ESI here, and a search specifically designed by them, Plaintiffs refuse to pay Caremark to collect, review, and produce responsive documents, if any.

Caremark should perform the above search, Plaintiffs say, in order to locate documents responsive to one of the following three requests:

> [Request] 2. Communications between you [Caremark] and Walgreens concerning contracts, agreements, and pharmacy manuals, including amendments, relating to the administration of prescription drug benefits that applied or that currently apply to any of the Plaintiffs' prescription drug purchases from Walgreens.

> [Request] 3. Communications with Walgreens concerning amendments to the definition of "usual and customary" price in contracts, agreements, and pharmacy manuals relating to the administration of prescription drug benefits.

> [Request] 4. Communications with Walgreens relating to the inclusion or consideration of the [Prescription Savings Club] Prices in the calculation, establishment, or reporting of its "usual and customary" price for PSC Drugs.

Ex. 1[2]; *see also* Mot. at 6.  Although these document requests all concern solely communications between Caremark and Walgreens, the search terms Plaintiffs are demanding are not designed to

---

[2] All references to "Ex." refer to the exhibits attached to the Geyerman Declaration.

identify only Caremark-and-Walgreens communications,[3] but rather any document that contains one of the search terms, even if it is a document circulated wholly internally at Caremark or with a third-party other than Walgreens.

The Motion also seeks an order compelling production of Caremark's privilege log, which is now a moot issue.  On July 10, 2020, Caremark produced a privilege log to Plaintiffs.[4]

## ARGUMENT

The Court should not compel Caremark to perform the requested search.  Caremark has already complied in good faith with Plaintiffs' (and Walgreens') subpoenas in this case. Furthermore, the requested search is unduly burdensome and not proportional to the needs of the case, on several levels.

## I.   Caremark Has Dutifully Fulfilled its Rule 45 Obligations.

Between August 2018 and today, Caremark has devoted substantial efforts to responding to three third-party subpoenas issued by Plaintiffs (two) and Walgreens (one).  That effort has resulted in (1) five separate productions of documents by Caremark (2) comprising more than 3,000 pages of documents and 88,000 lines of transaction data, and (3) Caremark's agreement to sit for a Rule 30(b)(6) deposition as soon as all document issues are resolved.[5]  In reaching this point, Caremark has engaged in extensive negotiations with both parties which puts the lie to Plaintiffs' suggestion that Caremark has shirked its obligations under Rule 45, or that Plaintiffs

---

[3] For example, none of the proposed search terms include the condition that "@walgreens.com" appear in the to/from/cc line of the e-mail.

[4] Geyerman Decl. ¶ 5.

[5] The Rule 30(b)(6) deposition was scheduled for July 15, 2020, but has been deferred pending a resolution of Plaintiffs' Motion.

were not given a fair opportunity for input in how Caremark would go about responding to their subpoenas.

### A.    Plaintiffs' August 24, 2018 Subpoena

Plaintiffs issued their first of two subpoenas to Caremark on August 24, 2018.  Ex. 2. The August 2018 subpoena defined the "Relevant Time Period" as January 1, 2007 through August 24, 2018, and included fifteen document requests as well as eleven topics for examination under Rule 30(b)(6).  Caremark served its objections on October 4, 2018, Ex. 3, and participated in a meet-and-confer two weeks later on October 17, 2018.  Geyerman Decl. ¶ 2. During this meet and confer, Plaintiffs explained that Caremark testimony was necessary to determine if Walgreens' Prescription Savings Club ("PSC") prices should have been considered its U&C under Walgreens' contract(s) with Caremark, and Caremark agreed to produce its Rule 30(b)(6) testimony given in a case in 2017—*Corcoran et al. v. CVS Health, et al.,* No. 15-cv-3504 (N.D. Cal.)—in order to answer that question.  *Id.*

As promised, Caremark produced the Rule 30(b)(6) transcript and all exhibits thereto one week later on October 25, 2018.  In the transcript and accompanying exhibits, Caremark explicitly set forth its understanding that "pharmacies offering Club Plans are not contractually required to submit to Caremark the Club Plan price as their usual and customary prices. Examples of Club Plans include the Walgreens Prescription Savings Club . . . ."  Ex. 4.  The exhibits to the deposition included contemporaneous evidence documenting this corporate position as early as 2008.  Ex. 5.

This previous corporate testimony from Caremark and corporate policy on whether club programs like Walgreens' PSC program were U&C prices was significant evidence because, as the Motion acknowledges, it answers the "ultimate issue in the underlying action"— "whether Walgreens was required to consider PSC prices in determining its usual and customary prices"

under its contract with Caremark.  Caremark's first production, made twenty-two months ago, definitively answered that question.  *See, e.g.*, *Sunbury Textile Mills, Inc. v. CIR*, 585 F.2d 1190, 1196 (3d Cir. 1978) ("Where, as here, there is no dispute between the contracting parties over the meaning of the terms . . .[t]heir harmonious recital of what these words mean is conclusive." (internal quotation omitted)).

      **B.**    **Plaintiffs' July 26, 2019 Subpoena**

Plaintiffs issued a second Rule 45 subpoena to Caremark on July 26, 2019.  Ex. 1. Plaintiffs' second subpoena included eight new document requests, one request for transactional data, and eight topics for examination under Rule 30(b)(6).  Several days later, Plaintiffs agreed to suspend indefinitely Caremark's response to the subpoena until such time as Plaintiffs could provide "specifics concerning what [additional] evidence Plaintiffs are interested in obtaining from Caremark," given it already had Caremark's corporate position on whether club programs are U&C prices.  Ex. 6.

Two-and-a-half months later, Plaintiffs sent Caremark a letter raising three issues relevant here:

1. "Gaps" Purportedly In Walgreens' Document Production:  Plaintiffs asked Caremark to (a) conduct a targeted search to identify any contracts or pharmacy manuals "between Caremark and Walgreens . . . that define, explain, or describe the term 'usual and customary' price," and (b) conduct an ESI search of five Caremark employees' files—Stephanie Harris, Todd Guinn, Robert Burge, Robert Stone, and William Wellman—for "communications with Walgreens" regarding Walgreens' Prescription Savings Club;

2. Transactional Data:  Plaintiffs asked Caremark to produce pharmacy transaction data for Walgreens' prescription purchases made by Plaintiff IBEW 38's members; and

3. Deposition:  Plaintiffs asked Caremark to provide dates for a Rule 30(b)(6) deposition.

Ex. 7.  Counsel for Caremark participated in a meet and confer regarding Plaintiffs' letter one week later on October 23, 2019, and filed its formal objections and responses shortly thereafter. Ex. 8.  As relevant to the present dispute, Caremark agreed to "meet and confer with Plaintiffs about the feasibility and burden of applying a reasonable set of search terms to certain Caremark custodians' documents ***that have previously been collected in similar litigation, in order to locate responsive documents***." *Id.*[6]  Caremark did not offer to search employee files that had ***not*** been collected for previous litigations.

### C.    Walgreens' November 8, 2019 Subpoena

Defendant Walgreens issued its own Rule 45 subpoena to Caremark on November 8, 2019, which included nine document requests and fourteen topics for examination under Rule 30(b)(6).  Ex. 9.  Contrary to the Motion's suggestion that Caremark responded more cooperatively to Walgreens than to Plaintiffs,[7] Caremark lodged the ***exact same*** objection to Walgreens' request for ESI searches that it lodged to Plaintiffs' request:  "Caremark is willing to meet and confer with Defendant and Plaintiffs about the feasibility and burden of applying a reasonable set of search terms to certain Caremark custodians' documents ***that have previously been collected in similar litigation, in order to locate responsive documents***."  Ex. 10.

### D.    Caremark's First ESI Search and Production

Caremark did not hear from Plaintiffs or Walgreens following its objections and responses to the parties' July and November 2019 subpoenas.  With the holidays, close of fact

---

[6] All emphases to quotations in this Brief are added, unless otherwise indicated.

[7] Mot. at 3 ("Notably, Caremark appears to have willingly complied with the production demands of a far broader and later-served subpoena from Walgreens.").

discovery,[8] and paternity leave all impending,[9] counsel for Caremark felt he could wait no longer and, on December 10, 2019, commissioned an ESI search consistent with its responses and objections to both Plaintiffs' and Walgreens' subpoenas—namely a search of certain employees' files that had been previously collected in the *Corcoran* case and a similar litigation.  The parameters for this search were as follows:

> **Custodians:**   Todd Guinn and Stephanie Harris
>
> **Timeframe:**   Todd Guinn (December 9, 2008 through July 21, 2015) and Stephanie Harris (December 9, 2008 through September 11, 2015)
>
> **Search Terms**: [1]PSC OR [2] Walgreen* and (usual w/2 cust*) OR [3](Walgreen* and (u pre/2 c)).

Although the Motion suggests that Walgreens directed Caremark to run this search, Mot. at 3, that is false.  Not having heard from either party, Caremark designed the search itself without the input of either party.

On January 16, 2020, Caremark produced the results of this first ESI search, which included more than 735 pages of e-mails and other documents.  Ex. 11.

### E.    Plaintiffs Ask Caremark to Fill Purported "Gaps" in Walgreens' Production.

On January 21, 2020, Plaintiffs sent Caremark a letter inquiring (1) "whether additional documents exist [at Caremark] to fill the gaps Plaintiffs have identified in Walgreens' production," and (2) whether Caremark had documents pertaining to an alleged meeting "the teams [at Caremark and Walgreens had] . . . the last week of June or the first week of July, 2017 to discuss changes that resulted in the 2018 Provider Agreement."  Ex. 12.  Plaintiffs identified

---

[8] At the time of production, fact discovery was set to close on February 28, 2020.  *See Forth v. Walgreens*, Civ. A. No. 17-cv-2246 (N.D. Ill.) at Dkt. No. 219 (Nov. 4, 2019).

[9] Geyerman Decl. ¶ 3.

Caremark's Todd Guinn, Stephanie Harris, William Wellman, and Thao Pham, Esq., as Caremark's representatives that attended the supposed June-July 2017 meeting.  *Id.* at 3 n.5.

      **F.**      **Caremark's Second ESI Search and Third, Fourth, and Fifth Productions.**

      On February 28, 2020, Caremark made its third production and produced a total of thirty documents relating to named-plaintiff Cynthia Russo's prescription purchases.

      Less than a month later, on March 18, 2020, Caremark made its fourth production, which included (1) the "missing" Provider Manuals that Plaintiffs had identified, (2) "Reconciliation Reports" for named-Plaintiff IBEW showing payments made by Caremark to IBEW in the course of their business relationship, and (3) the results of Caremark's second ESI search related to the meeting between Caremark and Walgreens that occurred, allegedly, the "last week of June or the first week of July, 2017."  Ex. 13.  The parameters of this second ESI search, selected directly in response to the information in Plaintiffs' January 21, 2020 letter, were as follows:

      **Custodians:**    Todd Guinn, Stephanie Harris, William Wellman, and Thao Pham, Esq.

      **Timeframe:**    June 1, 2017 through July 31, 2017

      **Search Terms**: [1]"prescription drug savings card program" OR [2](Walgreen* and "U&C") OR [3](Walgreen* and "usual and customary charge") OR [4]"prescription savings club."[10]

The March 18, 2020 production comprised over 1,900 pages of documents and e-mails.

      Finally, on May 27, 2020, Caremark made its fifth and final production, which comprised more than 88,000 lines of transaction data related to named-plaintiff IBEW 38's prescription purchases at Walgreens' pharmacies.  Ex. 14.

---

[10] Caremark (as opposed to outside counsel or an outside vendor) performed this second ESI search because Caremark had not previously collected *any* of these custodians' ESI for the timeframe identified by Plaintiffs, i.e., the "last week of June or the first week of July, 2017."

All of this discussion shows that Caremark has been more than diligent, over a two-year period, in producing documents in good faith, and responding to Plaintiffs' requests when they were reasonable.  Because Caremark has been more than diligent, it should not be compelled to take further actions now.

## II.     Requiring Caremark to Perform a Third ESI Search Is Unduly Burdensome and Disproportionate to the Parties' Needs in the Case.

Despite the extensive efforts discussed above, Plaintiffs argue there are four reasons why Caremark should be compelled to incur the time and expense of a third ESI collection, search, and production.  None has merit.

*First*, Plaintiffs argue that a third search is warranted to identify further Walgreens-Caremark communications because, supposedly, those communications bear on the "ultimate issue in the underlying action"—namely, "whether Walgreens was required to consider PSC prices in determining its usual and customary prices."  Mot. at 4.  *See also* Mot. at 14.  A third search is not necessary, in fact, to obtain evidence of Caremark's view on that issue.

In October 2018, Caremark produced documents demonstrating that Caremark does not, and has never, considered Walgreens' PSC program to be within the definition of "usual and customary" as that term appears in the Caremark-Walgreens contract.  Caremark has produced to both parties (1) a sworn declaration on the topic, Ex. 4, (2) corporate testimony from Caremark in another proceeding on the topic, and even (3) internal documents from as far back as 2008 memorializing this understanding.  Ex. 5.  Caremark produced this evidence to Plaintiffs when it was first subpoenaed in mid-2018, precisely because it should be all that the parties need to know to understand Caremark's position on the merits.

Plaintiffs provide no explanation as to why it is reasonable or proportionate to require Caremark to commission a third ESI search just to locate documents that, if anything, would

only confirm its long-held, contemporaneously documented understanding that club program prices are not U&C prices.  To the extent Plaintiffs need to confirm that this remains Caremark's understanding through the present day, they can do so at the Rule 30(b)(6) in this matter that Caremark has agreed to attend.

*Second*, Plaintiffs argue that a third search is warranted because of purported "gaps" in Walgreens' document production.  Mot. at 16.  In support of this argument, Plaintiffs claim that (1) "Walgreens has produced only limited communications regarding th[e] critical . . . [contract] renegotiation," in the spring of 2017, Mot. at 18, and (2) Caremark "unilaterally truncated the Relevant Time Period in the Subpoena."  *Id.* at 8.  Plaintiffs are both speculating and misleading.

As an initial matter, Caremark performed a targeted collection to identify and produce the contracts and Provider Manuals that Plaintiffs specifically identified for the company.  Caremark produced these documents on March 18, 2020.  Ex. 13.  Caremark has also answered most of Plaintiffs' follow-up questions that they have raised from time to time.  Ex. 15 (responding about transaction data and BIN/PCB/Group ID numbers).  Significantly, Plaintiffs' Motion does not identify any *particular document* that seems to be "missing" based on the parties' and Caremark's productions.  *See* Mot. at 18 (arguing that additional "communications are likely to exist because of the fact of the underlying action").  Rather, their speculation is that more communications must exist somewhere, and hence their claiming a "gap" should be filled.

The only concrete topic the Motion describes is the 2018 Provider Agreement between Caremark and Walgreens.  Plaintiffs' suggestion that there must be "missing" U&C-related communications surrounding that contract is belied by the record and, in all events, Caremark, a third-party, should not responsible for guaranteeing that every last document concerning that topic (or any other) is available in the case.  After Plaintiffs identified the Summer 2017

negotiations as a particular area of interest, Caremark commissioned a search from June 1, 2017 to July 31, 2017, and produced all responsive, non-privileged documents that it located from that search.  Ex. 13.  Caremark located eight communications between Walgreens and Caremark during that period.[11]  Despite their repeated assertion that additional "communications are likely to assist," ***Plaintiffs acknowledge that they currently have the complete set of "redline contracts" that document Walgreens and Caremark's negotiation of the usual and customary provision***.  Mot. at 17.  Given those redlined drafts, Plaintiffs cannot credibly argue that they lack sufficient information to formulate whatever arguments they need to make about the language of the final agreement (executed on July 31, 2017) or the negotiations prior to the execution.

Plaintiffs' argument that Caremark "unilaterally truncated" the "Relevant Period" in its search fails to acknowledge why Caremark targeted the dates that it did.  In its first ESI search (December 2019), Caremark leveraged its collections from the *Corcoran* and *Sheet Metals* cases and produced all responsive, non-privileged documents for the custodians Plaintiffs identified.[12] The dates for that production were determined by the dates that covered the prior collections. When Plaintiffs challenged the scope of that production and identified four specific Caremark employees that attended a meeting with Walgreens—that Plaintiffs said occurred the "last week of June or the first week of July, 2017"—Caremark promptly ran searches on these previously

---

[11] Though some of the responsive e-mails attached documents that pre-dated June 1, 2017, Caremark produced all responsive, non-privileged documents that it located without regard to the date each individual attachment was created.

[12] Of the five Caremark employees Plaintiffs' identified in their October 16, 2019 letter, Ex. 7, only two—Stephanie Harris and Todd Guinn—were custodians in the *Caremark* and/or *Sheet Metal* cases, and both custodians' files are limited to July 31, 2015, the date the *Corcoran* complaint was filed.

uncollected custodial files for the period June 1, 2017 through July 31, 2017, and produced all responsive, non-privileged documents that it located.

Plaintiffs make much of the fact that Caremark performed this second search in-house (rather than through an external e-discovery vendor), but Caremark did so in the interests of time and cost because it had theretofore not forensically collected those custodians' files for the timeframe at issue. Although the Motion complains about the timeframe that Caremark searched, Plaintiffs created that problem themselves: In their January 21, 2020 letter, Plaintiffs told Caremark that the meeting for which Plaintiffs wanted associated communications occurred in "***the last week of June or the first week of July, 2017***," Ex. 12, which is why Caremark searched that particular period. In the Motion, Plaintiffs contend for the first time that the meeting actually occurred on "April 13, 2017." Mot. at 17. Caremark did not search April 2017 because Plaintiffs misidentified the timeframe. Caremark should not be penalized for having relied upon Plaintiffs' wrong information. And it certainly does not warrant the Court now granting the broad relief the Motion requests—production of all communications between Walgreens and Caremark concerning the parties' contracts, U&C pricing, and the PSC program from January 1, 2016 through December 31, 2018.

***Third***, Plaintiffs' assertion that Caremark's "claim of burden must also be measured against the steps Caremark took in responding ***to Walgreens' subpoena*** and it [sic] lack of any burden in doing so" is legally and factually incorrect. Mot. at 3–4. The premise of this argument—that Caremark cooperated with Walgreens subpoena but did not cooperate for Plaintiffs—is wrong. In late-2019, Caremark told both parties that it was willing to search its documents collected from prior matters. When ***Plaintiffs*** stated that the production resulting from that process was insufficient, Caremark searched for and produced more e-mails, taking

into account **Plaintiffs'** suggestion of the period to search (the late-June/early-July 2017 period). Plaintiffs had some input into Caremark's search, but Walgreens had none.

"When determining whether a subpoena duces tecum results in an undue burden on a party such factors as the relevance of the documents sought, the necessity of the document sought, the breadth of the request . . , [and the] expense and inconvenience can be considered." *Behrend v. Comcast Corp.*, 248 F.R.D. 84, 86 (D. Mass. 2008) (internal quotations omitted). The expense and inconvenience on Caremark of entertaining yet another search is very significant, in part because Caremark has been subjected to **at least eight third-party subpoenas** in civil litigation concerning U&C prices since 2018—three in this matter, three in *United States ex rel. Strauser v. Stephen L. LaFrance*, Civ. A. No. 4:18-cv-006723 (N.D. Okla.), and two in *Stafford v. Rite Aid Corp.*, Civ. A. No. 3:17-cv-1340 (N.D. Cal.).  Notably, **four** of these eight subpoenas have been served by the same two law firms serving as Plaintiffs' counsel in this case and the *Stafford* case.  Any extra efforts Caremark takes to search for documents in this case will, inevitably, be cited against the company by litigants in other matters as "the minimum" efforts the company should be willing to perform in those cases.  As a prime example, minutes before Caremark filed the instant Brief, Plaintiffs' counsel (in their capacity as the *Stafford* lawyers) served Caremark with another harassing letter concern Caremark's efforts to comply with the *Stafford* subpoena.  Ex. 16.

**And fourth**, Plaintiffs' attempt to require Caremark to run search terms over four custodians' files over a three-year period represents a major expansion of the burden on Caremark.  As discussed above, Caremark has not previously collected **any** of these four

custodians' files for the period January 1, 2016 through December 31, 2018.[13]  And although Caremark was willing to incur the cost of an in-house, targeted search for documents created or received between June 1, 2017 and July 31, 2017, the burden multiplies eighteen-fold if expanded to the three-year period Plaintiffs now request.  The burden is compounded further by the fact that one of the proposed custodians, Thao Pham, is a *lawyer*.  Searching a lawyer's files would likely reveal many privileged documents.  While Caremark was willing to search Ms. Pham's documents during a discreet two-month period regarding communications surrounding a particular meeting, it is not willing to undertake the burden of reviewing three-years-worth of e-mails.  *See, e.g.*, *Sprint Commc'ns Co. L.P. v. Charter Commc'ns, Inc.*, 2019 WL 3369659, at *1 (D. Del. July 15, 2019) (denying motion to compel the inclusion of in-house counsel as an ESI custodian because "the Special Master properly weighed the potential benefits to the parties against the burden to Charter in gathering the ESI, filtering through the ESI for what is privileged, and then cataloging it.").

III.    **Caremark Has Not Waived Its Objections to Plaintiffs' Subpoenas.**

Finally, Plaintiffs argue that Caremark has "waive[d]" its ability to object to Plaintiffs' subpoenas.  Mot. at 14.  None of the three cases Plaintiffs cite in support of this "waiver" argument supports their position.

In *Williams & Cochrane, LLP v. Quechan Tribe of Fort Yuma Indian Reservation*, the court ***denied*** the plaintiffs' motion to "describe the key words used" in defendants' search and acknowledged that an "agreement [as to search terms] will not always be possible."  2020 WL

---

[13] The June/July 2017 search was performed in-house at Caremark.  Outside counsel does not have a copy of the custodians' email accounts that it could simply run the new proposed search terms against to locate documents for review.

274117, at *7 (S.D. Cal. May 27, 2020).  Here, Caremark made reasonable efforts to provide both parties with the information they requested.

In *DeGeer v. Gillis*, the court only ordered the third-party to run additional search terms after requiring the defendant issuing the subpoena to "split the financial burden for the additional terms and data custodians that the Court is allowing."  755 F. Supp. 2d 909, 930 (N.D. Ill. 2010).  Plaintiffs have rejected Caremark's request that they pay for any additional searching- and document-review costs.

Finally, in *Creative Machining & Molding Corp v. CRC Polymer Sys., Inc.*, the motion to compel was granted only after the moving party demonstrated with specific evidence that it "has been left with a gap in the documentary record."  2018 WL 1440320, at *3 (D. Mass. Mar. 22, 2018).  Plaintiffs make no such showing here.

## CONCLUSION

For the foregoing reasons, Caremark respectfully requests that this Court deny Plaintiffs' Motion in its entirety.  Alternatively, to the extent the Court is inclined to order Caremark to perform a third ESI search, the Court should require Plaintiffs to reimburse Caremark all costs associated with collecting, reviewing, and producing any responsive documents.  Fed. R. Civ. P. 45(d)(3)(C).

Dated: July 10, 2020                    Respectfully submitted,

                                        By: /s/ *Robert C. Corrente*

                                        Robert C. Corrente (RI Bar No. 2632)
                                        WHELAN, CORRENTE & FLANDERS, LLP
                                        100 Westminster Street, Suite 710
                                        Providence, RI 02903
                                        Telephone: (401) 270-4500
                                        Facsimile: (401) 270-3760
                                        rcorrente@whelancorrente.com

                                        Grant A. Geyerman (*Pro Hac Vice*)
                                        Andrew C. Watts (*Pro Hac Vice*)
                                        WILLIAMS & CONNOLLY LLP
                                        725 Twelfth Street, N.W.
                                        Washington, DC 20005
                                        Telephone: (202) 434-5000
                                        Facsimile: (202) 434-5029
                                        ggeyerman@wc.com
                                        awatts@wc.com

                                        *Attorneys for CVS Pharmacy, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 10, 2020, the foregoing **NON-PARTY CAREMARK,**

**LLC'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL** was filed electronically

and is available for viewing and downloading from ECF.


DATED:  July 10, 2020                    By:  _/s/  Robert C. Corrente_
                                         Robert C. Corrente