# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | |
|---|---|
| DOROTHY FORTH, LISA BULLARD, RICARDO GONZALES, CYNTHIA RUSSO, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 38 HEALTH AND WELFARE FUND, INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 295-295C WELFARE FUND, AND STEAMFITTERS FUND LOCAL 439, on Behalf of Themselves and All Others Similarly Situated, | Case No: 1:20-mc-00007-MSM-PAS<br><br>Underlying Action:<br>Civil No. 17-cv-2246<br>United States District Court<br>Northern District of Illinois<br><br>CLASS ACTION<br><br>ORAL ARGUMENT REQUESTED |
|        Plaintiffs,<br><br>       v.<br><br>WALGREEN CO.,<br><br>       Defendant. | **REPLY IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL NON-PARTY CAREMARK, LLC TO COMPLY WITH SUBPOENA** |

## TABLE OF CONTENTS

Argument ........................................................................................................................... 4

I.     Caremark Concedes the Relevance of the Requested Communications ........................... 4

II.    Complying with Plaintiffs' Narrowly Tailored Requests for Communications
Would Not Cause Caremark Any Burden that Is Undue .................................................... 7

      A.    Caremark Has Failed to Substantiate Its Claim of Burden ..................................... 7

      B.    Caremark Grossly Distorts the Factual Record ..................................................... 9

      C.    Caremark Demonstrates Its Failure to Meet and Confer Consistent
with an Open and Transparent Discovery Process ................................................ 12

      D.    Caremark Inappropriately Attempts to Collectivize Its Claim of Burden
by Reference to Other Subpoenas Brought by Other Parties, None of
Whom Are Currently Before the Court ................................................................. 14

III.    Caremark is Not Entitled to Cost Shifting ...................................................................... 15

Conclusion ....................................................................................................................... 18

## **<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*Apple, Inc. v. Samsung Elecs. Co.*,
   No. 12-CV-0630-LHK PSG, 2013 WL 1942163 (N.D. Cal. May 9, 2013) .....................13, 15

*Axcan Scandipharm Inc. v. Ethex Corp.*,
   Civil No. CV 07-2556, 2008 WL 11349882 (D. Minn. Dec. 31, 2008)...................................8

*United States* ex rel. *Baker v. Walgreens, Inc.*,
   No. 12-cv-300, ECF No. 22 (S.D.N.Y.) ...............................................................................6

*Brown v. Barnes & Noble, Inc.*,
   No. 116CV07333RAKHP, 2019 WL 7168146 (S.D.N.Y. Dec. 23, 2019) ..................9, 10, 13

*Creative Machining & Molding Corp. v. CRC Polymer Sys., Inc.*,
   No. CV 17-30043-MAP, 2018 WL 1440320 (D. Mass. Mar. 22, 2018)..................................2

*High Rock Westminster St., LLC v. Bank of Am., N.A.*,
   C.A. No 13-500S, 2014 WL 12782611 (D.R.I. June 17, 2014) ......................................16, 17

*Hopkins v. Buffalo Pumps, Inc.*,
   No. C.A. 09-181, 2009 WL 4496053 (D.R.I. Dec. 1, 2009)...................................................4

*In re Keeper of Records*,
   348 F.3d 16 (1st Cir. 2003) ................................................................................................13

*In re New England Compounding Pharmacy, Inc. Prod. Liab. Litig.*,
   No. MDL 13-2419-FDS, 2013 WL 6058483 (D. Mass. Nov. 13, 2013)................................7

*In re World Trade Ctr. Disaster Site Litig.*,
   No. 21 MC 100 (AKH), 2010 WL 3582921 (S.D.N.Y. Sept. 14, 2010) ..............................17

*United States ex rel. Garbe v. Kmart Corp.*,
   824 F.3d 632 (7th Cir. 2016) ...............................................................................................6

*Wells Fargo Bank, N.A. v. Konover*,
   259 F.R.D. 206 (D. Conn. 2009)........................................................................................17

**Statutes, Rules & Regulations**

Fed R. Civ. P. 45................................................................................................................12, 15

Plaintiffs Dorothy Forth, Lisa Bullard, Ricardo Gonzales, Cynthia Russo, International Brotherhood of Electrical Workers Local 38 Health and Welfare Fund ("IBEW Local 38"), International Union of Operating Engineers Local 295-295C Welfare Fund, and Steamfitters Fund Local 439 ("Plaintiffs") respectfully submit this reply in further support of their Motion to Compel Non-Party Caremark, LLC  to Comply with Subpoena (ECF No. 1) and the accompanying Memorandum of Law (ECF No. 7) (Plaintiffs' "Motion").

In its Response (ECF No. 11), Caremark, LLC ("Caremark") contends it has fully complied with Plaintiffs' subpoena and that any further action on its part would be an undue burden and not proportional to the needs of the case.  Caremark's portrayal of its compliance efforts is laughable. It is facially unreasonable for Caremark to characterize any burden associated with performing a so-called "third" search as undue when it never should have undertaken the first two searches in a patently deficient manner without meaningfully engaging in a meet and confer process with Plaintiffs.  Under the applicable legal standard, which Caremark fails to cite, Plaintiffs' narrowly tailored requests directed to Caremark are relevant to Plaintiffs' claims and Walgreens' defenses and Caremark fails to carry its burden to show that any burden in complying with the subpoena would be undue.

Caremark's Response simply fails to offer the Court any legally sound reason to deny Plaintiffs' Motion.  *First*, Caremark grossly misstates the applicable legal standard, suggesting that a motion to compel cannot be granted unless Plaintiffs identify "specific documents they know exist, but that are missing, from the parties' productions."  Courts, however, do not require movants to introduce evidence of absence, nor should they, otherwise motions to compel would be granted in only the rarest circumstances.  Instead, courts apply the familiar framework that considers whether the documents sought are relevant and whether the burden associated with production is

undue.  A movant satisfies the correct legal standard by showing that there is a "gap in the documentary record." *Creative Machining & Molding Corp. v. CRC Polymer Sys., Inc.*, No. CV 17-30043-MAP, 2018 WL 1440320, at *3 (D. Mass. Mar. 22, 2018).  Plaintiffs have shown exactly that.  Despite this, Caremark asks the Court to believe that following the issuance of a landmark decision regarding how "usual and customary" was meant to be interpreted and the initiation of the underlying action, Caremark – one of the nation's largest pharmacy benefit managers ("PBMs") and an entity alleged to be involved in the same scheme as Walgreens to fraudulently inflate usual and customary prices – did not communicate at all with Walgreens regarding these matters.  That simply cannot be believed.  And even though Plaintiffs are not required to make such a showing, as a factual matter, Plaintiffs have also shown that specific communications are absent from Walgreens' and Caremark's productions.   In particular, while Walgreens and Caremark have produced *some* communications relating to the contractual definition of "usual and customary," neither entity has produced emails transmitting certain proposed edits to the contractual definition of "usual and customary," or any communications regarding those proposed edits.  (*See* Motion at 17-18.)  Thus, Plaintiffs have demonstrated the relevance and reasonableness of their request for additional effort from Caremark to locate responsive information.

**Second**, Caremark largely ignores that Plaintiffs ask the Court only to compel the production of documents related to Caremark's **communications** with Walgreens.   Thus, Caremark's attempt to impress the Court by boasting about other documents it may have produced is of no moment because those documents were produced in response to requests that are beyond the ambit of Plaintiffs' Motion.  Caremark does not dispute that prior to Plaintiffs' Motion, for the period 2016-2018, it produced only *eight* emails that were exchanged between Caremark and Walgreens.

**Third**, Caremark's Response contains a stunning concession that the search terms Plaintiffs ask Caremark to apply are reasonable because they are the **exact same** search terms that Caremark used as part of its initial unilateral search to identify responsive communications.  *Compare* Response at 8 ("The parameters for this [initial] search were as follows . . . Search Terms: [1]PSC OR [2] Walgreen* and (usual w/2 cust*) OR [3](Walgreen* and (u pre/2 c))") *with* Response at 2 ("Plaintiffs seek an order compelling Caremark to run the following search . . . Search Terms: [1]PSC OR [2](Walgreen* and (usual w/2 cust*) OR [3](Walgreen* and (u pre/2 c)).).")  Caremark provides no explanation why it chose to use more restrictive terms for its second unilateral search, which it undertook to correct deficiencies with the initial search.

**Fourth**, Caremark inappropriately attempts to collectivize its burden by reference to other matters that are not before the Court and are not part of the underlying action.  Caremark cites no authority suggesting the service of a subpoena by other parties in other matters can establish that **this** subpoena presents an undue burden.  Indeed, Caremark's entire course of conduct evidences the mistaken presumption that the mere issuance of a subpoena presents an undue burden.  That is not the law.  And while Caremark claims that if the Court grants Plaintiffs' Motion, engaging in a collaborative meet and confer process will be the "minimum" the company is required to undertake in other cases – an assertion that cannot be assessed except by reference to the substance of other subpoenas that are not before the Court – the converse is also true.  If the Court accepts Caremark's arguments, when Caremark is subpoenaed in the future, one of the nation's largest PBMs will no longer consider it necessary to so much as meet and confer to discuss search terms.

For the additional reasons set forth below, the Court should grant Plaintiffs' Motion.

## ARGUMENT

**I.     Caremark Concedes the Relevance of the Requested Communications**

Caremark does not dispute that the communications Plaintiffs seek are relevant to Plaintiffs' claims and Walgreens' defenses.  By failing to present any argument to the contrary, Caremark has waived any challenge to the relevance of the requested communications.  *Hopkins v. Buffalo Pumps, Inc.*, No. C.A. 09-181 S, 2009 WL 4496053, at *8 (D.R.I. Dec. 1, 2009).

As set forth in Plaintiffs' Motion, the requested communications between Caremark and Walgreens emanate from a limited two-year span that saw the filing or unsealing of multiple actions challenging schemes to artificially inflate usual and customary prices, like the ones Walgreens and Caremark engaged in, as well as a critical contract negotiation that ███████ ███████████████████████████████████████"  Caremark represents that the relevant custodians have 3,156 documents potentially responsive to Plaintiffs' requests, a figure that represents less than 0.25% of the documents identified as potentially responsive in the underlying action.  Thus, Plaintiffs' requests are also proportional to the needs of the underlying action.

Caremark attempts to muddy the record by citing its production of documents responsive to Plaintiffs' *other* document requests.  But those documents do not evidence the communications that are sought by Request Nos. 2, 3, or 4.  Ex. 4 at 10.[1]  For example, Caremark erroneously claims that its production of a corporate policy document and testimony proffered in a different matter, *Corcoran v. CVS Health*, No. 15-cv-3504 (N.D. Cal.), "definitively" answers the question of whether Walgreens was required to report its Prescription Savings Club prices as its usual and

---

[1]     All references to "Ex." are to the Declaration of Carey Alexander in Support of Plaintiffs' Motion to Compel Non-Party Caremark, LLC to Comply with Subpoena (ECF No. 6) ("Alexander Decl.").

customary prices.  Response at 5-6.  But *Corcoran* addressed **CVS's** scheme of artificially inflating usual and customary prices and **CVS's** contracts with PBMs.  The testimony in *Corcoran* does not and cannot address **Walgreens'** contracts with Caremark.  Further, while Caremark's policy document may provide "Caremark's view" as to the ultimate question in the underlying action, Response at 10, neither the document nor Caremark's citation to dated out-of-circuit authority support Caremark's argument that Walgreens' contractual obligations have been "definitively" resolved such that communications regarding those obligations are no longer relevant.

Critically, neither Caremark's corporate policy nor the testimony from *Corcoran* evidence **communications** between Caremark and Walgreens that would be responsive to Request Nos. 2, 3, or 4.  Instead, Caremark's corporate policy and the testimony from *Corcoran* are responsive to Request No. 7, which called for the production of Caremark's "policies, procedures, practices, guidelines, or rules relating to the inclusion or consideration of prices offered under a Pharmacy Discount Program in the calculation, establishment, or reporting of a pharmacy's 'usual and customary' price." Ex. 4 at 10.

Caremark questions whether Plaintiffs have sufficiently identified any gaps in its underlying production of documents, suggesting that the mere production of eight emails in a two-year stretch between one of the nation's largest pharmacies and largest PBMs was not, by itself, evidence of a deficient production.  As set forth in Plaintiffs' Motion, Plaintiffs have every reason to believe that there are substantial gaps in the production of communications between 2016 and 2018.  The timeline of events overwhelmingly supports Plaintiffs' conclusion.  *Corcoran*, an action by consumers against Caremark's parent, CVS, was filed in July 2015.  No. 4:15-cv-3504, ECF No. 1 (N.D. Cal.).  *Sheet Metal Workers Local No. 20 v. CVS Pharmacy, Inc.*, an action by third-party payers against CVS, was filed in February 2016.  No. 16-cv-46, ECF No. 1 (D.R.I.).  The

Seventh Circuit's decision in *United States ex rel. Garbe v. Kmart Corp.* was decided in May 2016. 824 F.3d 632 (7th Cir. 2016).  The existence of a *qui tam* suit against Walgreens, in which the Department of Justice intervened, challenging Walgreens' reporting of artificially inflated usual and customary prices to government payers, was unsealed in January 2017.  *See United States* ex rel. *Baker v. Walgreens, Inc.*, No. 12-cv-300, ECF No. 22 (S.D.N.Y.).  And the underlying action was filed in March 2017.  *Forth*, ECF No. 1.  Yet, Caremark asks the Court to accept that it was able to identify only eight relevant communications between Caremark and Walgreens during this period.

Plaintiffs know that relevant communications existed during this period.  Soon after the underlying action was filed, ██████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████  As set forth in their Motion, Plaintiffs explained that while they have some communications related to this negotiation, it is clear that certain communications are missing.  In particular, while Caremark's corporate policy distinguishes between programs where "[m]embers need to join a plan" and those where "the program gives the set price to all participants," (Declaration of Grant Geyerman in Support of Non-Party Caremark, LLC's Opposition to Plaintiffs' Motion to Compel ECF No. 11, ("Geyerman Decl."), Ex. 5 at CAREMARK_FORTH-000250 (ECF No. 11-6)), neither Caremark nor Walgreens produced any communications addressing the fact that ████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████.  *See* Motion at 17-18 & Ex. 33 at Walg_Forth_00153728.  Communications regarding this change could have been identified through the application of proper search terms to the proper custodians for the proper time period,

which demonstrates the inadequacy of Caremark's prior search.  Such communications would be directly responsive to Request No. 3, requesting the production of communications "concerning amendments to the definition of 'usual and customary' price in contracts," and Request No. 4, requesting the production of communications "relating to the inclusion or consideration of the PSC Prices in the calculation, establishment, or reporting of its 'usual and customary' price for PSC Drugs." Ex. 4 at 10.

Plaintiffs have thus established the relevance of the communications sought.

## II.   Complying with Plaintiffs' Narrowly Tailored Requests for Communications Would Not Cause Caremark Any Burden that Is Undue

To establish that the burden presented by a subpoena is "undue," a party cannot offer mere speculation, but must instead show the "'manner and extent of the burden and the injurious consequences of insisting upon compliance.'"  *In re New England Compounding Pharmacy, Inc. Prod. Liab. Litig.*, No. MDL 13-2419-FDS, 2013 WL 6058483, at *6 (D. Mass. Nov. 13, 2013).[2] Caremark has failed to sustain this burden.

### A.   Caremark Has Failed to Substantiate Its Claim of Burden

Beyond stating that Plaintiffs' requested search would yield 3,156 documents, Caremark offers no factual support whatsoever establishing the existence of any burden that may be undue. This failure is particularly notable in light of Caremark's prior agreement to provide Plaintiffs with information regarding the cost of its prior search, which it still has not done.  Alexander Decl., ¶¶13 & 16.  While such information could have potentially substantiated Caremark's claim of undue burden, Caremark's continuing failure to provide such information to Plaintiffs or the Court should continue to weigh heavily against a finding that any burden of compliance is undue.

---

[2]      Unless otherwise indicated, citations are omitted and emphasis is added.

The identification of 3,156 documents using Plaintiffs' requested search terms demonstrates, as Plaintiffs claimed, that the overly restrictive search terms Caremark chose to apply were patently deficient. Caremark previously identified and produced only eight communications between 2016 and 2018. That Caremark has now identified over 3,000 documents using terms that it initially agreed were reasonable and applied to its initial search further confirms that there is not just a gap in the record, but a potentially significant one.

As Caremark acknowledges, however, it will likely not need to review all 3,156 documents because the reported figure is overinclusive and "almost certainly includes duplicate" documents that would not need to be reproduced. Response at 2. It is unclear how many of the identified documents are communications or their attachments, as opposed to purely internal documents. Caremark's failure to provide this to Plaintiffs so that they could collaboratively craft a potentially less burdensome search, or to the Court, forecloses its claim that any burden is undue. *See, e.g.*, *Axcan Scandipharm Inc. v. Ethex Corp.*, Civil No. CV 07-2556 (RHK/JSM), 2008 WL 11349882, at *17 (D. Minn. Dec. 31, 2008) (rejecting a hit count alone as "of very limited use to the Court" and noting that until a party "de-duplicates the results for identical documents, performs and reviews at least a reasonable sampling of documents (with and without certain search terms) to develop a realistic estimate of the numbers of documents likely to be responsive and non-privileged from each search, and then calculates the time and expense associated with a search for, review and production of these different searches, neither it nor the Court has any basis to conclude that inclusion of more search terms is too burdensome or that the burden is exceeds the benefit of the search").

Regardless, a review of 3,156 documents is proportional to the needs of the underlying action. As the party defending the underlying action, Walgreens collected over 5 million

8

documents for review, out of which 1.3 million documents were responsive to the parties' agreed-upon search terms, *Forth* ECF No. 137 at 5, which included the terms Plaintiffs seek to have applied here, including "psc", "u pre/2 c", and "usual w/2 cust*".  Alexander Decl., ¶4.  Thus, any burden associated with reviewing 3,156 documents – which represents less than 0.25% of the documents identified in the underlying action – for a time period in which Caremark has only produced eight communications, is not undue or disproportionate, especially given the relevance of events that occurred in 2016-2018.  *Cf. Brown v. Barnes & Noble, Inc.*, No. 116CV07333RAKHP, 2019 WL 7168146, at *3 n.3 (S.D.N.Y. Dec. 23, 2019) (noting that the "average case can involve the collection and/or review of 100 gigabytes of data, which is equivalent to 6.5 million pages of Microsoft Word documents").

### B.     Caremark Grossly Distorts the Factual Record

Caremark's Response is rife with mischaracterizations of the factual record.  Perhaps most egregious is Caremark's recitation of its search efforts.  Caremark's first unilateral "search" considered only of the leftover scraps from the *Corcoran* and *Sheet Metal* cases, which Caremark acknowledges "were limited to July 31, 2015" and did not include any communications made beyond that point.  Response at 12 n.12.  Caremark claims that this search resulted in the production of "735 pages of e-mails and other documents," Response at 8, which may sound impressive, but fails to recognize that Caremark actually produced only 64 communications from a nearly seven-year period.  Alexander Decl., ¶11.  Caremark acknowledges that it designed its search "without the input of either party," but fails to explain why.  Caremark only offers that its counsel "felt he could wait no longer," Response at 8, an explanation that falls short given counsel's repeated failure to substantively meet and confer with Plaintiffs as explained *infra* Section II.C.  Indeed, if counsel had informed Plaintiffs that he would be leaving on paternity leave, Plaintiffs would have accommodated Caremark's counsel as a matter of professional

courtesy.  Had Caremark engaged with Plaintiffs, Plaintiffs would have reiterated that, as set out in Plaintiffs' October 16, 2019 letter, Ex. 11 at 2-3, they were having difficulty identifying communications related to the ███████████████████████████████████████████, and thus, any search that was limited to July 31, 2015 was certain to be insufficient.

Caremark claims that its second unilateral search was conducted "directly in response to the information in Plaintiffs' January 21, 2020 letter."  Response at 9.  That letter, however, did not ask Caremark to undertake a unilateral search.   Rather, Plaintiffs specifically stated that they "seek to meet and confer with Caremark regarding its search for such communications" to understand why there was a gap in the record.  Ex. 12 at 3.  Plaintiffs further asked to "meet and confer to discuss the set of custodians," and "to propose a set of search terms to facilitate Caremark's search following the parties' agreement on the custodians to be searched."  Id. at 4. No fair reading of that letter conveys any understanding that Caremark would undertake a unilateral search without any further substantive meet and confers.  Nor should have Plaintiffs expected otherwise in light of the discovery rules that require parties and non-parties alike "to meet and confer about custodians of relevant ESI, date ranges for searches of ESI, and other search parameters." *Brown*, 2019 WL 7168146, at *3 (collecting cases).

More puzzling still is Caremark's unilateral decision to narrow the search terms it used in its initial search.  Instead of searching for documents using the terms it previously recognized were likely to identify responsive documents, including "PSC," (usual w/2 cust*), and (u pre/2 c), Caremark instead chose to search using overly restrictive terms like "prescription savings club" and "usual and customary charge."   As set forth in Plaintiffs' Motion, these narrow terms were guaranteed to exclude responsive communications.   Motion at 11-12.  Caremark knew and understood that it and Walgreens referred to and utilized the term "PSC" to refer to the Prescription

Savings Club, yet Caremark provides no explanation whatsoever for its decision to unilaterally narrow the terms it had previously deemed reasonable, likely because the decision is indefensible. It is thus no surprise that Caremark's search identified only eight responsive communications.

Having failed to meet and confer with Plaintiffs to discuss the basic parameters of an ESI search, such as the appropriate custodians, search terms, and date ranges, Caremark now admits that the date range it unilaterally selected may not have, in fact, identified all of the relevant meetings that Caremark had with Walgreens. Response at 13. But Plaintiffs specifically and repeatedly informed Caremark that the relevant negotiations "spanned many months." *E.g.*, Ex. 15 at 4; Ex. 13 at 2 (characterizing the lack of associated communications as "especially troubling in light of in-person *meetings* that Caremark employees had at Walgreens in 2017"). Further, as a participant in those meetings, Caremark and its employees should have known exactly when any relevant meetings took place. Caremark's counsel affirmatively represented that Caremark's "search" would specifically involve asking the relevant custodians what meetings they recalled attending before searching for all associated communications. Ex. 15 at 2. Counsel further represented that he "asked the three current employees who you believe attended the meeting for documents they have associated with that meeting." *Id.* Thus, Caremark cannot credibly claim that it was unaware when the relevant meetings took place. Moreover, Caremark's claim that its second ESI search was undertaken only for the period "June 1, 2017 through July 31, 2017," Response at 9, directly contradicts counsel's repeated representations that Caremark engaged in a search that considered a "three-month period." *See, e.g.*, Ex. 17 at 1; Ex. 18 at 1. Having failed to substantively meet and confer with Plaintiffs, Caremark cannot now claim that any misunderstanding based on its jumping the gun was innocent.

11

Finally, Caremark claims that "Plaintiffs make much of the fact that performed this second search in-house," Response at 13, but that is simply not true.  Instead, because Plaintiffs were only interested in receiving the requested communications, and mindful of their obligations pursuant to Fed R. Civ. P. 45 to minimize the burden on Caremark, Plaintiffs specifically told Caremark that "Plaintiffs would not require the use of an independent third-party vendor, as [Caremark's counsel] indicated [he] believed [Plaintiffs] would." Ex. 17 at 1.  Plaintiffs further specifically confirmed that they would "accept an electronic search conducted by Caremark's IT professionals." *Id.*  That Caremark conducted its search in-house, though, was relevant "to the extent that Caremark intends to claim that conducting the requested search Plaintiffs request is unduly burdensome." Ex. 16 at 1.  Plaintiffs accordingly requested that Caremark "identify the costs incurred in conducting" its second ESI search, *id.*, which Caremark agreed to do, Ex. 17 at 1, but never did.  Alexander Decl., ¶16.  Indeed, to the extent Caremark continues to raise cost and burden as a basis to deny Plaintiffs' Motion, the record is devoid of any information Caremark can cite to support its argument.

In sum, Caremark's first uniliteral search was, from the start, deficient and not designed to identify the relevant communications with Walgreens between 2016 and 2018.  Caremark's second unilateral search was the result of willful blindness that applied facially deficient search terms to an incomplete time period.  Caremark cannot now claim that any burden associated with correcting its self-inflicted errors would be undue.

## C.   Caremark Demonstrates Its Failure to Meet and Confer Consistent with an Open and Transparent Discovery Process

Caremark seeks to claim burden on the basis of issues that it never disclosed to Plaintiffs and that it should have raised through the meet and confer process.

For example, in its Response, Caremark discloses for the very first time that one of the requested custodians, Thao Pham, was actually an attorney.  Despite a record that spans more than

700 pages of exhibits addressing Plaintiffs' Motion, Caremark cannot cite a single page where it previously disclosed what it attempts to characterize as an important fact bearing on its potential burden.

In prior correspondence, when Caremark had the opportunity to disclose that Ms. Pham was an attorney, Caremark's counsel instead represented only that he "cannot say at this time what documents, if any, remain at Caremark from the email account of Ms. Pham, a former employee. She left Caremark for another company several years ago."  Ex. 14.  Such basic factual information, such as whether a requested custodian is an attorney, should not be disclosed for the first time in the process of adversarial briefing, but is exactly the type of information that should have been disclosed as part of an open and transparent discovery process.  *See Brown*, 2019 WL 7168146, at *3; *Apple, Inc. v. Samsung Elecs. Co.*, No. 12-CV-0630-LHK PSG, 2013 WL 1942163, at *3 (N.D. Cal. May 9, 2013).

Caremark's failure to timely disclose basic factual information about a requested custodian is, however, as disappointing as it is irrelevant.  Plaintiffs' Motion asks the Court to compel only communications between Caremark and Walgreens.  By their nature, such communications would not be privileged because "[w]hen otherwise privileged communications are disclosed to a third party, the disclosure destroys the confidentiality upon which the privilege is premised."  *In re Keeper of Records*, 348 F.3d 16, 22 (1st Cir. 2003).  Thus, because Plaintiffs seek only communications that were necessarily disclosed to a third party, and Caremark asserts no other basis for a claim of privilege, Caremark's claim of burden on account of Ms. Pham's status as an attorney is of no moment.

Caremark further attempts to claim that the burden of running Plaintiffs' requested search is undue because the search terms are "not designed to identify only Caremark-and-Walgreens

communications." Response at 3-4 & n.3. Caremark instead suggests that the search terms should instead include "@walgreens.com" in the "to/from/cc line" (and presumably bcc line) of any email. Response at 4 n.3. Plaintiffs are not opposed to replacing the reference to "Walgreens" in their proposed search terms with such a term; however, Plaintiffs note that this is exactly the sort of modification that the parties should have been able to discuss during the meet and confer process, rather than through adversarial briefing.

### D.   Caremark Inappropriately Attempts to Collectivize Its Claim of Burden by Reference to Other Subpoenas Brought by Other Parties, None of Whom Are Currently Before the Court

Caremark cites no authority suggesting that it is appropriate to weigh the burden imposed by Plaintiffs' subpoena by reference to the collective impact of *other* subpoenas of unknown scope brought by parties that are not before the Court.

As a factual matter, Caremark's claim that such other subpoenas present a burden is disingenuous. For example, Caremark complains about the receipt of two subpoenas from Plaintiffs in the underlying action. The first was the initial subpoena. Ex. 2. Then, as discussed with Caremark, "to account for the discovery Plaintiffs received from [Walgreens]," Plaintiffs served an amended subpoena in which the "categories of documents requested in the subpoena were narrowed from those contained in the original subpoena." Ex. 11 at 1; *see also* Ex. 4. Further, "[t]he scope of the subpoena was also narrowed for the express purpose of reducing Caremark's burden in preparing for deposition and producing responsive documents." Ex. 11 at 1. It is unclear why Caremark feels burdened by Plaintiffs' decision to narrow the scope of its subpoena to reduce the potential burden to Caremark.

Caremark identifies two other actions in which it has received subpoenas, claiming that in the past four years, Caremark – one of the largest PBMs in the country – has been burdened by the receipt of "ten" subpoenas. Response at 3. Caremark, however, concedes that in response to these

14

subpoenas, it has done little more than hand over the publicly available documents from *Corcoran*. *See* Response at 3 (conceding that Caremark has run no searches in response to any other subpoena). Thus, at most, Caremark's supposed burden consists of meeting and conferring in two other actions.

Indeed, Caremark characterizes a letter sent by counsel in another action as "harassing," (Response at 14 citing Geyerman Decl., Ex. 16) but fails to explain why. From all appearances, the letter is a run-of-the-mill memorialization of the parties' meet and confer efforts, which only further establishes that Caremark appears to consider the very receipt of a subpoena as an undue burden. This notion cannot be reconciled with Rule 45, which expressly authorizes the issuance of subpoenas to non-parties like Caremark.

For Caremark to claim that responding to these subpoenas is burdensome "confuses undue burden with its obligations, once subject to a subpoena, to participate in transparent and collaborative discovery." *Apple, Inc.*, 2013 WL 1942163, at *3 (further noting that "[t]hird-party status does not confer a right to obfuscation or obstinacy"). Caremark's attempt to collectivize its claim of burden thus fails.

## III.   Caremark is Not Entitled to Cost Shifting

Caremark asks the Court to order Plaintiffs to reimburse *all* costs associated with conducting the search Caremark should have run in the first instance. To be clear, Plaintiffs *never* refused to consider paying Caremark's costs to the extent appropriate. In fact, the opposite is true. *See* Exs. 14 & 15 at 4; Alexander Decl., ¶13. It is important to note that in responding to the subpoena, Caremark has yet to perform a forensically sound collection of ESI. Instead, Caremark merely ran unilaterally selected search terms across ESI previously collected *in 2015* for different actions, which necessarily means Caremark's search would not have resulted in the production of responsive information in the 2016-2018 time frame. Caremark's second search was similarly run

in-house, and despite repeated requests from Plaintiffs to meet and confer regarding search terms and custodians, Caremark again proceeded unilaterally. Thus, Caremark's self-proclaimed victimization over having to perform a so-called "third" search is a sham. It is facially unreasonable for Caremark to claim it is being forced to perform a "third" search when it never should have undertaken the first two searches in a patently deficient manner without consultation with Plaintiffs. Importantly, when Caremark claimed that performing a forensically sound collection would cause undue burden, Plaintiffs requested that Caremark provide Plaintiffs with specific information regarding the burden and cost associated with obtaining relevant custodian email files and running search terms to respond to Request Nos. 2, 3 and 4. Exs. 14 & 15 at 4; Alexander Decl., ¶13. Despite agreeing to do so, to date, Ex. 16 at 1, Caremark has not provided such information. Alexander Decl., ¶¶15 & 16. As explained above, Caremark repeatedly failed to provide Plaintiffs with information that Plaintiffs could have considered to limit the potential burden on Caremark. This includes the failure to disclose: the terms it used to conduct its searches; that one of the requested custodians was an attorney; a privilege log (which would have revealed the same); and any information regarding the costs associated with conducting its ESI search, despite agreeing to do so. Caremark's refusal to engage in good faith in the meet and confer process, which may have resulted in increased costs and burden to Caremark, does not warrant the imposition of cost-shifting to Plaintiffs when Caremark does not meet its burden under the relevant legal standard, which Caremark fails to cite.

An inquiry into whether cost-shifting is appropriate requires consideration of three factors: "(1) whether the non-party has an interest in the outcome of the litigation; (2) whether the non-party can more readily bear the costs of production than the requesting party; and (3) whether the litigation is of public importance." *High Rock Westminster St., LLC v. Bank of Am., N.A.*, C.A.

No 13-500S, 2014 WL 12782611, at *1 (D.R.I. June 17, 2014).   Each factor cuts against Caremark's request.

As to the first prong, courts consider "whether the non-party was substantially involved in the underlying transaction and could have anticipated that such transaction could potentially spawn litigation or discovery." *Wells Fargo Bank, N.A. v. Konover*, 259 F.R.D. 206, 207 (D. Conn. 2009) (collecting cases).   As one of the PBMs that Plaintiffs will show willingly turned a blind eye to Walgreens's reporting of artificially inflated usual and customary prices, Caremark was involved in potentially millions of transactions that form the basis of Plaintiffs' allegations.   Moreover, Caremark is a current defendant in *Sheet Metal* and the subsidiary of the defendant in *Corcoran*, both of which are class actions challenging a similar attempt to artificially inflate "usual and customary prices."   Caremark was thus not only aware that its actions could spawn litigation (and the resulting issuance of subpoenas), but also has a direct interest in the outcome of the underlying action.   This factor heavily cuts against any request for cost-shifting.

As to the second prong, Caremark does not address, let alone refute, Plaintiffs' claim that its corporate parent, CVS Health Corp., raked in revenues exceeding $130 billion in each of the last three years.   Motion at 22.   Plaintiffs, by contrast, are consumers and third-party payers who are represented by counsel working on a contingent basis.   Thus, this factor also heavily cuts against any award of cost-shifting.   *High Rock Westminster St., LLC*, 2014 WL 12782611, at *2 (declining to shift costs where non-party was "a major global real estate services company that has the internal expertise and resources to bear the costs of compliance"); *In re World Trade Ctr. Disaster Site Litig.*, No. 21 MC 100 (AKH), 2010 WL 3582921, at *2 (S.D.N.Y. Sept. 14, 2010) (declining to shift costs to non-party non-profit that was "equipped to shoulder these costs, even

recognizing that like all non-profit hospitals, it is pressed financially in many other aspects of its

core activities").

As to the final prong, the underlying litigation is of clear public importance.  As alleged in

Plaintiffs' Third Amended Complaint, 90% of Americans have private insurance and 89% of

dispensed prescriptions are generic drugs.  Ex. 1, ¶¶2-3.  For more than a decade Walgreens (and

Caremark's corporate parent) are alleged to have artificially inflated the price of these generic

prescription drugs, raising the cost of healthcare for insured Americans.  *Id.*, ¶¶8-11.  It requires

no citation to know that healthcare costs remain an ongoing issue of critical public importance.

Thus, this factor also weighs against Caremark's request.

The Court should not shift to Plaintiffs any costs Caremark might incur by running the

search it should have run in the first instance.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Motion.


Dated:  July 17, 2020                              Respectfully Submitted,
                                                   **SCOTT+SCOTT ATTORNEYS AT LAW LLP**


                                                    /s Joseph P. Guglielmo
                                                   Joseph P. Guglielmo (*pro hac vice*)
                                                   Carey Alexander (*pro hac vice*)
                                                   The Helmsley Building
                                                   230 Park Avenue, 17th Floor
                                                   New York, NY 10169
                                                   Telephone: 212-223-4478
                                                   Facsimile:  212-223-6334
                                                   *jguglielmo@scott-scott.com*
                                                   *calexander@scott-scott.com*


                                                   Erin Green Comite (*pro hac vice*)
                                                   **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
                                                   156 S. Main Street

P.O. Box 192
Colchester, CT 06415
Telephone: 860-531-2632
Facsimile:  860-537-4432
*ecomite@scott-scott.com*

Jason H. Alperstein
Mark J. Dearman
Stuart A. Davidson
**ROBBINS GELLER RUDMAN
 & DOWD LLP**
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone: 561-750-3000
Facsimile:  561-750-3364
*jalperstein@rgrdlaw.com*
*mdearman@rgrdlaw.com*
*sdavidson@rgrdlaw.com*

***Interim Co-Lead Counsel***

Edward Roy
James O'Neil
**O'NEIL LAW**
The Meadows, Suite A-103
1130 Ten Rod road
North Kingstown, RI  02852
Telephone:  401 667-7111
Facsimile:  401 667-7112
edward_roy@hotmail.com
jamesoneil228@gmail.com

***Local Counsel***